2007 UT 12

**Von Lester TAYLOR, Plaintiff and Appellant,**

v.

**STATE of Utah, Defendant and Appellee.**

No. 20040262.

Supreme Court of Utah.

Jan. 26, 2007.

Rehearing Denied March 27, 2007.

743

Richard P. Mauro, Salt Lake City, for plaintiff.

Mark L. Shurtleff, Att'y Gen., Thomas Brunker, Erin Riley, Asst. Att'ys Gen., Salt Lake City, for defendant.

DURHAM, Chief Justice:

## INTRODUCTION

¶ 1 This case comes before us as an appeal from the district court's summary judgment order denying death row inmate Von Lester Taylor's petition for relief under the Post–Conviction Remedies Act (PCRA). Taylor argues that he is entitled to post-conviction relief primarily because he received ineffective assistance of counsel from both his trial and appellate counsel. Specifically, he argues that appellate counsel was ineffective for failing to (1) challenge Taylor's guilty plea; (2) conduct a mitigation investigation or challenge trial counsel's failure to investigate and present mitigation evidence; (3) challenge the jury instructions; (4) challenge the voir dire procedure; (5) challenge trial counsel's behavior during jury selection; (6) challenge the trial court's failure to order competency hearings; (7) challenge the admission of hearsay evidence at sentencing; (8) raise a claim of prosecutorial misconduct; and (9) raise various constitutional challenges to his death sentence. We address each of Taylor's claims in turn and ultimately affirm the district court's order of summary judgment.

## BACKGROUND

¶ 2 In December 1990, Taylor escaped from a halfway house where he was housed while on parole following a prison term for aggravated burglary. Thereafter, Taylor and an accomplice, Edward Steven Deli, broke into the Tiede family cabin while the family was away. When Mrs. Kay Tiede returned to the cabin with her daughter, Linae Tiede, and her mother, Beth Potts, Taylor and Deli ordered them upstairs, tied them up, and killed Kay Tiede and Beth Potts. During the shooting, Linae started praying, but Taylor told her to stop because he was a "Devil worshiper." Taylor and Deli then told Linae to pack a suitcase so she could leave with them.

¶ 3 Mr. Rolf Tiede and his daughter Ticia Tiede returned to the cabin shortly after the shootings. Upon their arrival, Taylor ordered them into the garage, told Rolf Tiede to remove his clothing, and stole $105 from his wallet. Although Rolf Tiede complied with all of Taylor's orders, Taylor shot him. After being shot, Rolf Tiede played dead, but Taylor returned and shot him in the head at point blank range, doused him in gasoline, and lit the cabin on fire. Taylor and Deli then fled the cabin with Linae and Ticia as hostages, stole Rolf Tiede's car, and led police on a high speed chase with the girls in the car before finally being caught and arrested. Rolf Tiede survived the ordeal.

¶ 4 After Taylor's arrest, Elliot Levine (trial counsel) was appointed as his defense attorney. Taylor eventually pled guilty to two counts of criminal homicide for the murders of Kaye Tiede and Beth Potts in exchange for the State's agreement to drop the remaining charges. The case proceeded to the penalty phase in May 1991. The jurors unanimously sentenced Taylor to death. In addition, the jurors unanimously found that the State had proven, beyond a reasonable doubt, that Taylor had committed the aggravating crimes of (1) attempted criminal homicide; (2) aggravated arson; (3) aggravated kidnaping; (4) aggravated robbery; (5) theft; (6) failure to respond to an officer's signal; and (7) possession of a firearm by a person on parole. A month after being sentenced, Taylor filed a motion to withdraw his guilty plea. The trial court denied the motion.

¶ 5 In October 1991, Taylor, through trial counsel, filed a notice of appeal with this court. Thereafter, Taylor fired his trial counsel, and the district court appointed Bruce Savage (appellate counsel) to represent Taylor. Appellate counsel filed a motion under rule 23B of the Utah Rules of Appellate Procedure with this court to remand to the district court for fact finding regarding Taylor's ineffective assistance of counsel claim. This court granted the motion.

¶ 6 The rule 23B hearing was held in May 1995. At the hearing, appellate counsel argued that trial counsel had provided ineffec-

tive assistance of counsel because (1) trial counsel's closing argument reflected his personal theory that the role of defense counsel was to encourage a defendant to admit his wrongdoing; (2) trial counsel advised Taylor that the evidence of the dismissed charges would not be raised in the penalty phase, and Taylor relied on this advice when pleading guilty; and (3) trial counsel's compensation from the State was· so inadequate that he was not able to devote the necessary time and effort to this case or conduct an adequate mitigation investigation, thereby creating a conflict between his personal financial interests and Taylor's interests.

¶ 7 The 23B court rejected Taylor's claims for ineffective assistance of counsel. Specifically, the court found that (1) trial counsel's closing argument did not reflect his personal belief, but was a strategic move designed to gain the jury's sympathy; (2) trial counsel did not advise Taylor that no evidence of the dismissed charges would be raised at the penalty phase; and (3) trial counsel's meager compensation, alone, was insufficient to support a claim for ineffective assistance of counsel. In addition to the above findings, the district court noted that even if trial counsel had been ineffective for failing to conduct an adequate mitigation investigation, Taylor had not demonstrated prejudice because he could not show a "reasonable probability" that the jury would have reached a different outcome if trial counsel had not committed the alleged errors.

¶ 8 Taylor, who continued to be represented by appellate counsel, appealed to this court. In *State v. Taylor* (*Taylor I* ), 947 P.2d 681 (Utah 1997), we affirmed the 23B court's findings, holding that (1) the court did not err in finding that trial counsel had not misinformed Taylor about the scope of the penalty phase, *id.* at 685–86; (2) the court did not err in concluding that trial counsel "did not actually believe a defense attorney should help his client admit to his wrongdoing," *id.* at 686; (3) Taylor's inadequate compensation claims "failed to demonstrate an actual conflict of interest," *id.* at 688; and (4) Taylor "failed to identify deficiencies in [trial counsel's] performance," particularly in his closing argument, that "had any apparent effect on the outcome of his penalty trial," *id.*

¶ 9 After this court decided *Taylor I*, the district court appointed Richard Mauro to represent Taylor pursuant to the PCRA. Mauro filed a petition for relief under the PCRA in February 1999. After the parties resolved a variety of procedural and expense matters, the petition was amended in May 2002. The amended petition contained twenty-five grounds for relief.

¶ 10 In response to Taylor's petition, the State moved for summary judgment. Specifically, the State argued that Taylor's claims were procedurally barred and that appellate counsel had not overlooked any obvious claims that probably would have resulted in a reversal. In his response to the State's motion, Taylor filed the affidavits of a licensed psychologist, the director of the Salt Lake Legal Defender Association, and a paralegal trained in investigating capital cases.

¶ 11 The post-conviction court granted the State's motion for summary judgment. It recognized that each of Taylor's "claims ha[d] been raised in support of [Taylor's] more general assertion that he received ineffective assistance of both trial and appellate counsel." The court held that all ineffective assistance of trial counsel claims were procedurally barred because they "ha[d] been or could have been brought by [Taylor] through appellate counsel at the time of the 23(b) [sic] remand hearing." Thus, the court concluded, Taylor's ineffective assistance of trial counsel claims "only [needed to] be assessed in the context of ineffective assistance of appellate counsel." The court then proceeded to "review [Taylor's claims] against a standard of whether appellate counsel failed to raise an issue which was obvious from the record and which, if raised, would probably have resulted in a reversal."

¶ 12 After the post-conviction court granted the State's motion, Taylor appealed to this court. We have jurisdiction pursuant to Utah Code section 78-2-2(i) (2002).

## STANDARD OF REVIEW

¶ 13 " 'We review an appeal from an order dismissing or denying a petition for

post-conviction relief for correctness without deference to the lower court's conclusions of law.'" *Gardner v. Galetka*, 2004 UT 42, ¶ 7, 94 P.3d 263 (quoting *Rudolph v. Galetka*, 2002 UT 7, ¶ 4, 43 P.3d 467). When confronted with ineffective assistance of counsel claims, we review a lower court's purely factual findings for clear error, but review the application of the law to the facts for correctness. *Menzies v. Galetka*, 2006 UT 81, ¶ 58, 150 P.3d 480.

## ANALYSIS

■ ¶ 14 Under the PCRA, Utah Code Ann. §§ 78-35a-101 to -304 (2002 & Supp. 2006), a person "convicted and sentenced for a criminal offense may file an action in the district court ... to vacate or modify the conviction or sentence." *Id.* § 78-35a-104(1) (2002). Post-conviction relief is a collateral attack on a conviction or sentence; it is not a substitute for appellate review. *Carter v. Galetka (Carter III)*, 2001 UT 96, ¶ 6, 44 P.3d 626. A defendant is not eligible for post-conviction relief on any ground that was raised on appeal or that could have been raised on appeal. Utah Code Ann. § 78-35a-106 (2002). Thus, on an appeal from a post-conviction order, this court will only address the merits of claims that could not have been raised prior to the post-conviction proceeding below or claims that, due to the gravity of a death sentence, need to be addressed "to ensure that substantial justice is done." *Carter III*, 2001 UT 96, ¶ 17, 44 P.3d 626.

■ ¶ 15 Taylor has already argued ineffective assistance of counsel in a direct appeal. *Taylor I*, 947 P.2d 681, 684 (Utah 1997). Because Taylor has already challenged the effectiveness of his trial counsel on appeal, his post-conviction claims that his trial counsel was ineffective are procedurally barred. Likewise, Taylor could have challenged the trial court's decisions or challenged the constitutionality of the death penalty on direct appeal; thus those claims are also barred.

■ ¶ 16 However, the post-conviction proceeding presented Taylor with his first opportunity to challenge the effectiveness of his appellate counsel. A defendant has the right to the effective assistance of appellate counsel under the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Bruner v. Carver*, 920 P.2d 1153, 1157 (Utah 1996). A post-conviction petitioner can show that his appellate counsel was ineffective by showing that appellate counsel prejudiced his case " 'by omitting a [claim that is a] "dead-bang winner." ' " *Carter III*, 2001 UT 96, ¶ 48, 44 P.3d 626 (quoting *Banks v. Reynolds*, 54 F.3d 1508, 1515 (10th Cir.1995)). This requires the petitioner to show that appellate counsel omitted an " 'issue which is obvious from the trial record and one which probably would have resulted in reversal on appeal.' " *Id.* (quoting *Banks*, 54 F.3d at 1515 n. 13).

■ ¶ 17 To determine whether appellate counsel missed an obvious claim on appeal, "we examine the merits of the [omitted] issues." *Id.* "Failure to raise an issue that is without merit does not constitute constitutionally ineffective assistance of counsel because the Sixth Amendment does not require an attorney to raise every nonfrivolous issue on appeal." *Id.* (internal quotation marks omitted). Thus, we look to the merits of Taylor's claims that his appellate counsel was ineffective for failing to challenge (1) Taylor's guilty plea; (2) trial counsel's mitigation investigation; (3) the jury instructions; (4) the jury voir dire; (5) trial counsel's performance during jury selection; (6) Taylor's competency at sentencing and at the 23B proceeding; (7) the admission of the Manley statement; (8) the misconduct of the prosecutors; and (9) the constitutionality of his death sentence.

## I. TAYLOR IS NOT ENTITLED TO WITHDRAW HIS GUILTY PLEA

¶ 18 We begin by addressing Taylor's argument that his appellate counsel was ineffective for failing to challenge Taylor's guilty plea. Taylor alleges that his guilty plea was unlawful because (1) he did not know that evidence of the dismissed charges could be used at the penalty phase; (2) the trial court did not inform him of his presumption of innocence; and (3) the trial court did not explain the difference between Taylor's testi-

mony at trial and at the penalty phase or the difference between a penalty-phase testimony and allocution.

¶ 19 Taylor has already challenged his guilty plea before this court. *See Taylor I,* 947 P.2d 681, 685–86 (Utah 1997). In *Taylor I,* Taylor asserted that his trial counsel was ineffective because he misinformed Taylor about the use of the dismissed charges at the penalty phase. *Id.* at 685. We held that "[e]vidence presented at the rule 23B hearing supports the finding that [trial counsel] correctly informed Taylor about the scope of the penalty phase." *Id.* We likewise noted that the plea transcript undermined Taylor's claim that he did not know that evidence of the dismissed charges would be admissible because the State informed the court and trial counsel during the plea hearing that it would seek to admit evidence of the dismissed charges. *Id.* Because appellate counsel already raised this claim on appeal and lost, Taylor cannot meet the standard of showing that appellate counsel was ineffective for failing to raise a "dead-bang winner." Moreover, we are satisfied with our conclusion in *Taylor I* and see no need to readdress the merits of this issue.

¶ 20 We likewise conclude that appellate counsel did not miss an obvious claim by failing to argue that the plea court should have informed Taylor that he was entitled to a presumption of innocence. While the current version of rule 11 requires a court to ascertain that a defendant "knows of the right to the presumption of innocence," Utah R.Crim. P. 11(e)(3) (2006), the 1991 iteration of rule 11 did not. The closest requirement contained in the 1991 rule was that the court ascertain that the defendant understood "that upon trial the prosecution would have the burden of proving each [element of the offense] beyond a reasonable doubt." Utah R.Crim. P. 11(5)(d) (1991). The trial court satisfied this requirement, specifically asking Taylor whether he understood that the State was "under an obligation to prove to the jury beyond a reasonable doubt each and everyone [sic] of [the] elements" of the charged offenses. Taylor replied that he understood. This was adequate under the 1991 version of rule 11. Because the colloquy was not erro-

neous, appellate counsel could not have overlooked an obvious claim on appeal.

¶ 21 Moreover, appellate counsel was not ineffective for failing to raise on appeal the trial court's failure to inform Taylor about the difference between testimony and allocution. In 1991, rule 11 did not impose a requirement that a trial court ascertain a defendant's knowledge about the implications of testimony at the guilt phase as compared to the penalty phase or a defendant's knowledge about the difference between testimony and allocution. Indeed, rule 11 has never required the trial court to make such an inquiry. Both the 1991 and the current versions of rule 11 require only that a trial court inform a defendant that he has a right "against compulsory self-incrimination." Utah R.Crim. P. 11(e)(3) (2006); Utah R.Crim. P. 11(5)(c) (1991). The trial court did inform Taylor of this right, specifically telling Taylor that he would "have the right to take the stand and to testify in [his] own behalf[,] . . . [but that he] would have the right to remain silent . . . [and that he could not] be forced to testify." Thus, we do not think the trial court's plea colloquy was infirm in this respect.

¶ 22 Because the trial court's colloquy was proper under rule 11 when Taylor entered his plea, we hold that appellate counsel was not ineffective for failing to challenge the court's proceedings or trial counsel's effectiveness. We therefore affirm the post-conviction court's grant of summary judgment on this issue.

## II. TRIAL COUNSEL'S INADEQUATE MITIGATION INVESTIGATION DID NOT PREJUDICE THE DEFENSE

¶ 23 Taylor next argues that his appellate counsel was ineffective for failing to challenge trial counsel's inadequate mitigation investigation and for not conducting his own thorough mitigation investigation that would have revealed that Taylor suffered from brain damage. In order to fully understand Taylor's claims, we begin with a recitation of the relevant facts.

¶ 24 Before Taylor pled guilty to the Tiede cabin murders, he notified the court that he

intended to pursue a defense based on insanity or diminished mental capacity. As a result, the district court appointed Drs. Mark Rindflesh and Louis A. Moench to examine Taylor's mental condition. The purpose of these evaluations was to assess Taylor's mental state at the time of the murders in order to determine whether he met the requirements for a defense based on insanity or diminished capacity.

¶ 25 Dr. Rindflesh reported that Taylor "ha[d] no history of involvement with counselling [sic] or therapy from mental health professionals for drug or alcohol abuse, or any other psychiatric problem." He stated that Taylor had used drugs and alcohol in high school, but that he had quit using drugs. Moreover, Dr. Rindflesh indicated that he "did not observe any disturbance of [Taylor's] thought processes or his thought content" or any "signs of hallucinations or delusions." Rather, he noted that Taylor "was able to organize and present his ideas in a logical manner," that Taylor's mood was "stable and appropriate," and that Taylor "reported no symptoms of any psychiatric illness." Dr. Rindflesh also reported that Taylor's "level of intelligence appear[ed] to be within the range of normal." Thus, Dr. Rindflesh concluded that Taylor did not suffer from a mental illness either at the time of the evaluation or at the time of the killings.

¶ 26 Dr. Moench likewise concluded that Taylor was not mentally ill for purposes of an insanity defense. Dr. Moench suggested that Taylor suffered from depression, an anti-social personality disorder with schizoid personality features, and a learning disability. He also stated,

> [t]he random property destruction in the cabins …, and the destruction of human life itself, is a level of violence sometimes seen with head injured or otherwise brain damaged people. However, [Taylor] present[ed] no history of head injury and no evidence for brain impairment other than some degree of learning disability in math and English.

Dr. Moench reported that Taylor appeared to have normal intelligence.

¶ 27 Dr. Moench also examined Taylor's past history. For example, his report indicated that "[i]n third grade [Taylor] once became upset and 'tore the class apart.' Psychological help was recommended…. His parents asked for a class change instead of arranging treatment." Dr. Moench's report noted that Taylor was self-conscious about a scar on his cheek, Taylor's sister considered him a "loner," and Taylor was diagnosed with "Adjustment Disorder with Mixed Emotional Features and elements of Passive Aggressive Personality Disorder" while serving his burglary prison sentence. The Moench report stated that Taylor had been interested in "black magic, satanism, or witchcraft" and had attended animal sacrifices. However, the report noted that he was there "more as an observer than a devoted participant."

¶ 28 Taylor ultimately pled guilty, and the jury never saw the Rindflesh and Moench reports. Despite contemplating an insanity defense and reading the information contained in the Moench report, trial counsel did not conduct a separate investigation into Taylor's mental health or hire his own expert to evaluate Taylor. At sentencing, the State indicated that it would attempt to introduce the Moench report if trial counsel introduced psychological evidence. Trial counsel also did not obtain Taylor's school records or personal health records or investigate whether there were juvenile court records or records from social service agencies. He likewise did not speak to any of Taylor's friends or siblings, but spoke only to Taylor's parents.

¶ 29 At sentencing, trial counsel called only three mitigation witnesses. First he called James Holland, a death-row inmate who testified about life in prison. Trial counsel then called Taylor's father, who testified that Taylor was "a quiet, loving individual," always "polite and courteous." He also testified that he did not remember the subject of mental health counseling ever being raised and that he had not noticed any "unusual psychological problems." He stated that Taylor was "quiet, reserved, liked to be to himself, [and] was self conscious," but that he never thought it was due to anything other than his personality. The final witness called by trial counsel was Taylor, who testified that he was sorry.

¶ 30 Taylor first raised the argument that trial counsel had been ineffective for not conducting a mitigation investigation on direct appeal. This court remanded the appeal to the district court for a hearing under rule 23B of the Utah Rules of Appellate Procedure. At the rule 23B hearing, trial counsel testified regarding his penalty phase performance. He stated that, at the time of the trial, he did not know that there were mitigation experts available to review evidence and testify in death penalty cases. He also expressed skepticism about expert witnesses for mitigation purposes, stating that it is possible to find an expert that will back up any theory. He stated that he believed the two court-appointed doctors were independent and that he did not believe it was necessary to hire another psychologist or psychiatrist to evaluate Taylor. He also believed that there was evidence in both the Moench and Rindflesh reports that was not favorable to Taylor and testified that it was a "tactical decision" not to put psychological experts on the stand. Trial counsel admitted that he did not acquire Taylor's school or health records, but stated that he did not think it was necessary after asking Taylor about school and his health. He thought Taylor and his father were the two best witnesses because he wanted to "make Mr. Taylor as human as possible" and show that he was not a violent person.

¶ 31 Following the hearing, the 23B court found that Taylor had received effective assistance of counsel. The 23B court found that counsel's decisions not to obtain or present psychological evidence were strategic because the information in the Moench report was counterproductive to the "boy next door" image the defense was hoping to present. Moreover, the 23B court noted that Taylor had not demonstrated that counsel would have found anything if he had performed a mitigation workup.

¶ 32 We affirmed in *Taylor I*, 947 P.2d 681, 686 (Utah 1997). In that case, we held that a defense attorney must "adequately investigate all potentially mitigating factors." *Id.* Nevertheless, we denied Taylor's claim for relief. We recognized that trial counsel "knew about Taylor's childhood psychological problems resulting from a facial scar, a learning disorder, and substance abuse in his family." *Id.* at 687. But we did not conclude that his decision not to introduce them was erroneous, noting that a defense attorney "does not have an obligation to introduce [mitigating] evidence if she believes after a thorough investigation that it will harm the case or if other strategic reasons for its omission exist." *Id.* Moreover, Taylor failed to identify any other mitigating information that might have been discovered by additional investigation. *Id.* We held that "[a] defendant must show not only that counsel failed to seek mitigating evidence, but also that some actually existed to be found." *Id.* Because Taylor failed to meet this burden, we denied his claim.

¶ 33 In his post-conviction petition, Taylor asserted that trial and appellate counsel should have conducted a mitigation investigation into his background, spoken to his siblings, and investigated the possibility of brain damage. According to Taylor, such an investigation would have revealed that he had "no prior criminal history and was generally known as a non-violent and compassionate person," that he was a minor participant in the crime, and that he suffered from brain damage. In support of this argument, Taylor offered the affidavits of Linda Gummow, Ph.D., a licensed psychologist; Ted Cilwick, a paralegal and licensed private investigator; and F. John Hill, the director of the Salt Lake Legal Defender Association.

¶ 34 Dr. Gummow's affidavit reported her belief that "there were sufficient issues in 1991 to raise the issue of brain damage as a possible explanation for Mr. Taylor's criminal acts." She based her conclusion upon the following: (1) Taylor had been "involved in a significant number of accidents and other episodes associated with brain injury," including a backwards fall down a flight of stairs onto a cement landing, a rollover car accident, a headfirst fall off of a sled onto a cement sidewalk, "a possible motorcycle accident," "a prison injury caused when Mr. Taylor hit his head on a metal stairwell," and a facial injury caused by the explosion of an aerosol can; (2) Taylor had been exposed to pesticides and other farm chemicals that can

contribute to brain injury; (3) Taylor's learning disability, which was diagnosed by Dr. Moench, could indicate brain damage; and (4) there was some evidence in Taylor's behavior of psychiatric disorders, which can indicate brain damage. Dr. Gummow further stated that the possible brain damage and Taylor's psychiatric condition had not been "adequately explored" at the penalty phase.

¶ 35 Dr. Gummow concluded that "[b]ased upon [her] training, experience, and the obvious clues available in 1991, Mr. Taylor should have undergone a neuropsychological evaluation." After conducting her own evaluation, Dr. Gummow reported that her "test findings identified moderate brain damage." She specifically noted seeing deficiencies in Taylor's "verbal fluency, receptive language, articulation, memory, . . . tactual skills, fine motor coordination, and some executive skills." Dr. Gummow did not, however, link her brain damage diagnosis to Taylor's conduct. She stated only that "[b]rain damage is especially relevant in explaining violent or out of control behavior. A brain injured person often cannot fully appreciate the wrongfulness of his conduct or conform his conduct to requirements of law." Moreover, Dr. Gummow's diagnosis that Taylor has moderate brain damage was not accompanied by a diagnosis of a low I.Q. She reported that Taylor has an I.Q. of "106 to 110 with 100 representing the population mean." While Dr. Gummow did not speak to Taylor's family, she noted that interviews they gave to a diagnostic evaluator in 1989 indicated that Taylor was susceptible to (1) wide mood swings, (2) suicide attempts, (3) significant social withdrawal, (4) substance abuse and lack of ability to control anger in his youth, and (5) being a follower.

¶ 36 Mr. Cilwick's affidavit stated that he is a paralegal and private investigator who has received training in capital cases, has worked as a court-appointed investigator in capital cases, and has worked closely with mitigation specialists in capital cases. Mr. Cilwick was retained as an investigator in post-conviction proceedings in this case. Specifically, Mr. Cilwick was asked to "interview members of the Taylor family." Mr. Cilwick interviewed Taylor's parents and siblings. In his affidavit, he stated that each sibling told him that "they were never interviewed, consulted or met with at any time during the entire history of [Taylor's] case." Moreover, after Mr. Cilwick had interviewed [Taylor's] siblings, Taylor's parents remarked "that they were unaware" of many of the things described by the siblings. Taylor's siblings told Mr. Cilwick that Taylor "was peaceful, loving, and non-violent as a child." They also described various head injuries Taylor had sustained, described him as "a follower" who was quiet and was picked on by other kids, and told Mr. Cilwick about a "history of mental health and drug and alcohol problems in the family." Taylor's mother related an incident when Taylor fell backwards down the stairs and Taylor's father told Mr. Cilwick about Taylor's exposure to "considerable amounts of chemicals on the farm in Idaho." Taylor's brother Steven described an incident several days before the murders when Taylor and Edward Deli visited him and told Mr. Cilwick that "Deli was running the whole thing."

¶ 37 F. John Hill's affidavit stated that due to his experience as a defense attorney who had represented persons charged with capital murder, he was familiar with the process by which a mitigation investigation was conducted in the 1980s and early 1990s. After reviewing the evidence, Mr. Hill concluded that "[t]rial counsel should have consulted a neurologist and other medical experts in this case to determine if Mr. Taylor had brain injury or brain damage." This conclusion was based on his opinion that in the 1980s and early 1990s, "brain injury . . . was one [of] the most important mitigating factors in a penalty phase hearing." He opined that "[a] minimally competent capital litigator should have known, based upon the evidence available in [the] early 1990's," including the Moench report, "that Mr. Taylor probably suffered from brain damage." Moreover, he noted, "It was well known in the third district in 1990 and 1991, [that] brain damage affects human behavior in significant and dramatic ways . . . . [and that] [b]rain injury is often the cause of conduct associated with criminal behavior[,] . . . gross disturbances in judgment and reasoning, disinhibition of im-

pulses, and in personality changes." According to Mr. Hill, in 1991, "[t]here [was] no strategic reason for failing to investigate and present evidence of brain injury to a penalty phase jury."

¶ 38 The State moved to strike the affidavits of F. John Hill and Ted Cilwick. Specifically, the State alleged that Mr. Hill's testimony was inadmissible because substandard representation was a legal question for the court and because Mr. Hill was not competent to testify "about how brain injury affects human behavior." The State argued Mr. Cilwick's testimony was inadmissible because "it [was] inadmissible expert testimony on a legal conclusion," it "[was] inadmissible hearsay," and "Mr. Cilwick provide[d] insufficient foundation to demonstrate the relevance of the proffered testimony."

¶ 39 The post-conviction court granted the motion to strike the affidavit of Mr. Cilwick because it "contain[ed] primarily hearsay that would be inadmissible in this post conviction case." The court also agreed to strike paragraph 11 of Mr. Hill's affidavit, but "otherwise allow[ed] the remainder of the Affidavit to stand." Paragraph 11 of Mr. Hill's affidavit stated,

> It was well known in the third district in 1990 and 1991, [that] brain damage affects human behavior in significant and dramatic ways. There is high correlation between brain injury and violent conduct over which the person has little control. Brain injury is often the cause of conduct associated with criminal behavior. Brain damage is associated with gross disturbances in judgment and reasoning, disinhibition of impulses, and in personality changes. This is especially relevant to the penalty phase hearing as brain damage impairs those cognitive functions associated with an individual's self-regulation of behavior, resulting in irrational decision making, the inability to inhibit behavioral impulses, or the inability to accurately evaluate consequences of one's behavior through reasoning. Evidence of brain injury is obviously a critical and important component of a penalty phase hearing because it addresses [ ] two statutory mitigating circumstances.

Mr. Hill specified the mitigating circumstances to which he was referring in paragraph 9. The mitigating circumstances were (1) the murder was committed while the defendant was under the influence of extreme mental or emotional disturbance; and (2) at the time of the murder, the capacity of the defendant to appreciate the criminality (wrongfulness) of his conduct or to conform his conduct to the requirement of law was substantially impaired as a result of mental disease, intoxication, or influence of drugs.

¶ 40 After striking the Cilwick affidavit and paragraph 11 of the Hill affidavit, the post-conviction court granted the State's motion for summary judgment. The court noted that Taylor's mitigation claim was procedurally barred because it had been raised on direct appeal. Nevertheless, the post-conviction court proceeded to address the merits of the claim "to ensure that [Taylor] ha[d] not been denied an obvious or substantial constitutional right." It held that appellate counsel's decision to pursue the mitigation investigation as part of the conflict of interest claim was a reasonable, strategic decision. Moreover, the district court found that, despite Dr. Gummow's affidavit, Taylor had not alleged "that his moderate brain damage [was] somehow related to his criminal conduct." Likewise, the court concluded that the evidence of Taylor's background and family history did not "undermine[ ] the Court's confidence in the jury's verdicts." Thus, the post-conviction court held that Taylor had not raised an issue of fact regarding appellate counsel's competence, and granted the State's motion for summary judgment on this issue.

### A. The Hill and Cilwick Affidavits Were Admissible

¶ 41 Before addressing Taylor's ineffective assistance claims, we address Taylor's argument that the post-conviction court erred in striking the Cilwick affidavit and paragraph 11 of the Hill affidavit.

¶ 42 The post-conviction court declared the Cilwick affidavit inadmissible because it was based primarily on hearsay. We disagree. Hearsay is "a statement, other than one

made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Utah R. Evid. 801(c). In this case, Taylor offered the Cilwick affidavit to show what his siblings would have revealed if trial counsel had spoken to them. While Mr. Cilwick recited statements made by the siblings, Taylor did not offer them for the truth of the matter asserted. In other words, Taylor did not offer the statements in the affidavits to prove that he was "a quiet and withdrawn child" or to prove that he had been in various accidents. Rather, he offered the affidavit to show that if trial counsel had conducted a mitigation workup and spoken to Taylor's siblings, he would have found mitigation evidence that could have been offered at trial or could have opened doors to further investigation.

¶ 43 We recognize that Taylor did offer a couple of the statements in the affidavit for the truth of the matter asserted, and these statements are therefore inadmissible. Specifically, Mr. Cilwick stated that "[e]ach sibling said they were never interviewed, consulted or met with at any time during the entire history of [Taylor's] case," and that Taylor's parents "remarked ... that they were unaware of many of the things described ... by their children." As a practical matter, however, these statements were not necessary to Taylor's post-conviction case because they were cumulative. The record already contained evidence that trial counsel never interviewed Taylor's siblings as that was included in the 23B court's factual findings. Likewise, Taylor's father testified at trial that he did not recall the subject of mental health counseling ever being raised and that he never noticed any psychological problems or mood swings, "but many times the parent is the last one to see and know."

¶ 44 We also hold that paragraph 11 of the Hill affidavit was admissible. The State argues that paragraph 11 was inadmissible because Mr. Hill was not qualified to testify about the ways in which brain damage affects human behavior. We agree that Mr. Hill was not qualified to offer scientific testimony about the effects of brain damage, but paragraph 11 was not being offered as an expert opinion about the effects of brain damage. Rather, it was offered to show that a reasonable defense attorney practicing in 1990 and 1991 would have known that there was evidence that brain damage can affect human behavior in various ways, and thus, "[e]vidence of brain injury [was] ... a critical and important component of a penalty phase hearing." Mr. Hill was fully qualified to offer this testimony. For this purpose, paragraph 11 was admissible.

### B. Trial Counsel Did Not Render Ineffective Assistance of Counsel Under *Strickland v. Washington*

¶ 45 We next address Taylor's claims that his trial counsel was ineffective for failing to conduct an adequate mitigation investigation on appeal and that his appellate counsel was ineffective for failing to adequately challenge trial counsel's performance. While appellate counsel did address trial counsel's mitigation strategy, he did so in the context of trial counsel's conflict of interest due to his low compensation. He did not raise an independent claim that the investigation was inadequate, and he did not conduct his own investigation to determine what trial counsel may have missed.

¶ 46 We examine Taylor's claims of ineffective assistance of counsel using the test set forth by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Under *Strickland*, Taylor must show "that counsel's performance was deficient." *Id.* at 687, 104 S.Ct. 2052. If Taylor satisfies this test, he must then show "that the deficient performance prejudiced the defense." *Id.* We address each part of the *Strickland* test as it relates to Taylor's claim of ineffective assistance of trial counsel below.

### 1. Trial Counsel's Performance was Deficient

¶ 47 Taylor claims that trial counsel's performance was deficient because he failed to conduct an adequate mitigation investigation. An attorney "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691, 104

S.Ct. 2052. This duty is magnified in death penalty cases. *Harries v. Bell*, 417 F.3d 631, 637 (6th Cir.2005). When we assess claims that counsel's mitigation investigation was defective, we do not ask whether counsel had strategic reasons for not presenting certain mitigating evidence, but rather "whether the investigation supporting counsel's decision not to introduce mitigating evidence ... *was itself reasonable.*" *Wiggins v. Smith*, 539 U.S. 510, 522–23, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). Accordingly, "strategic choices made after [a] less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690–91, 104 S.Ct. 2052.

¶ 48 We assess the "reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* at 690, 104 S.Ct. 2052. In determining whether counsel's investigation was reasonable, we "consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins*, 539 U.S. at 527, 123 S.Ct. 2527. However, counsel's conduct is presumed to be reasonable. *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. A defendant claiming his trial counsel conducted an inadequate investigation therefore must overcome "the strong presumption that counsel's [investigation fell] within the wide range of reasonable professional assistance." *Id.*

¶ 49 Therefore, our inquiry in this case is whether trial counsel's investigation fell within "the wide range of reasonable professional assistance" in 1991. To make this determination, we look to the information available to trial counsel. We also consider the prevailing professional norms at the time. In this case, we find evidence of the prevailing norms in the Hill affidavit as well as in the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (the ABA Guidelines). *See Menzies v. Galetka*, 2006 UT 81, ¶ 90, 150 P.3d 480.

¶ 50 We conclude that trial counsel's decision to stop investigating did not fall within the "wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. At the very least, we think the Moench report's indicia of personality disorders and possible brain damage would have prompted a reasonable attorney to investigate further. The Hill affidavit supports this conclusion. According to Mr. Hill, it was widely known in 1991 that evidence of brain damage was "one of the most important" pieces of mitigating evidence that could be offered at sentencing. Moreover, Mr. Hill opined that based upon the evidence in the Moench report, a "minimally competent capital litigator should have known ... that Mr. Taylor probably suffered from brain damage," and that "[t]rial counsel should have consulted a neurologist and other medical experts ... to determine if Mr. Taylor had brain injury or brain damage." In light of the Moench report and in light of Taylor's consideration of entering an insanity defense, we agree with Mr. Hill's conclusion that a reasonable attorney would have conducted an independent investigation into the possibility of brain damage.

¶ 51 However, a reasonable investigation in this case would have included more than just a separate consultation with a neurologist or other medical experts. The ABA Guidelines in place at the time of Taylor's penalty phase instructed counsel to "collect information relevant to the sentencing phase," including information about the defendant's (1) medical history, such as information about "mental and physical illness or injury, alcohol and drug use, birth trauma and develop[mental] delays"; (2) educational history, such as information about "achievement, performance and behavior" and "special educational needs [ ] including cognitive limitations and learning disabilities[ ]"; and (3) family and social history. Guideline 11.4.1(D)(2)(C), p. 94 (1989). Based upon the prevailing professional norms reflected in the ABA Guidelines, we think that reasonable trial counsel at the time of Taylor's penalty phase would have spoken to Taylor's immediate family members and friends to determine whether they knew if Taylor had suffered head injuries or whether they had any other informa-

tion that would suggest brain injury. In addition, we think reasonable trial counsel would have conducted an independent investigation into Taylor's health records, rather than merely relying on his representations about his medical history. *See Harries,* 417 F.3d at 638 (discussing trial counsel's performance in the 1980s and stating that "[t]he sole source of mitigating factors cannot properly be that information which defendant may volunteer; counsel must make some effort at independent investigation in order to make a reasoned, informed decision as to their utility" (citation and internal quotation marks omitted)). Finally, we think reasonable trial counsel would have obtained school records, particularly in light of the third-grade incident described in Dr. Moench's report and Dr. Moench's conclusion that Taylor had a learning disability. Based on trial counsel's failure to investigate any of the above evidence, we conclude that his investigation fell outside the "wide range of reasonable professional assistance." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052.

¶ 52 We recognize that Drs. Moench and Rindflesh concluded that Taylor did not present any evidence of head injury or brain impairment and was not mentally ill. Nevertheless, their conclusion does not excuse trial counsel's failure to conduct his own mitigation investigation into Taylor's mental health. Drs. Moench and Rindflesh conducted their evaluations for the purpose of determining whether Taylor could satisfy the requirements of the insanity test, not to determine whether Taylor had brain damage. Indeed, the Hill affidavit noted that "a minimally competent capital attorney in 1991 should have known that an investigation into sanity would yield little useful mental health information since the inquiry for insanity was so limited." Moreover, Dr. Gummow stated that the tests Drs. Moench and Rindflesh used to evaluate Taylor are "not generally accepted as instruments to diagnose brain damage." Had trial counsel contacted his own expert instead of relying on the reports by the court-appointed doctors, he likely would have realized this. We do not mean to suggest that the court-appointed doctors in this case were not competent. Rather, we think they were retained for the very limited

purpose of evaluating Taylor's sanity and that it was unreasonable for trial counsel to rely solely on them with regard to the penalty phase mitigation investigation. *See Dickerson v. Bagley,* 453 F.3d 690, 696–97 (6th Cir.2006) (holding that it was not reasonable in the 1980s for counsel to limit his mitigation investigation to the crime itself and the determination of whether the defendant was sane at the time he committed the crime).

¶ 53 This case is similar to the Sixth Circuit case of *Harries v. Bell,* 417 F.3d 631. In that case, the defense attorneys limited their investigation to contacting two family members by telephone, sending information requests to some of the institutions in which the defendant had been confined, and interviewing the defendant, his co-defendant, and two of the state witnesses. *Harries,* 417 F.3d at 638. The attorneys did request "two court-ordered competency evaluations," but they "declined to seek the assistance of a mental health expert or conduct a thorough investigation of [the defendant's] mental health," even after they had been alerted to possible mental illness by the defendant's mother. *Id.* In their defense, Harries' attorneys argued that they did not believe evidence of the defendant's background would be helpful. *Id.* Looking in part to the ABA Guidelines, the Sixth Circuit held that trial counsel's performance was ineffective, specifically stating that failing to investigate because counsel does not think it will help does not constitute a strategic decision, "but rather an abdication of advocacy." *Id.*

¶ 54 Like Harries' attorneys, trial counsel in this case did not speak to all of Taylor's immediate family members. He did not obtain Taylor's school records. Further, he did not conduct a thorough investigation into Taylor's mental health, even though Taylor contemplated raising an insanity defense and Dr. Moench indicated that Taylor had exhibited signs of a personality disorder and demonstrated behavior consistent with brain damage. Instead, trial counsel relied exclusively on the sanity evaluations conducted by two court-appointed doctors.

¶ 55 As in *Harries,* the State in this case argues that counsel's failure to investigate

was a strategic decision because trial counsel wanted to prevent the State from introducing harmful evidence contained in the reports, specifically Taylor's confession to Dr. Rindflesh that he had been involved in satanic worship. But the failure to investigate in this case did not constitute a strategic decision. Trial counsel could not adequately weigh the harm of evidence in the Moench report without conducting a thorough mitigation investigation. Moreover, trial counsel's decisions do not appear to have been entirely strategic; rather, they appear to be based, in part, on his lack of knowledge of mitigation experts and his belief that all experts were "hired guns" and that it was unethical to use them. Notwithstanding trial counsel's lack of knowledge of mitigation experts, his failure to investigate solely because of his belief that the psychiatrists' reports contained harmful information and that experts were "hired guns" was inexcusable. It did not constitute a reasonable strategic decision, "but rather an abdication of advocacy." *Id.* at 638.

## 2. Trial Counsel's Performance Did Not Prejudice Taylor

¶ 56 Having determined that trial counsel's performance was deficient, we now turn to whether it was prejudicial. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052. To prove trial counsel's performance was prejudicial, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. 2052.

¶ 57 However, when determining whether the evidence counsel would have discovered is sufficient to undermine confidence in the outcome of the case we do not consider that evidence on its own. Rather, we "consider the totality of the evidence before the judge or jury." *Id.* at 695, 104 S.Ct. 2052. In a death penalty case, the question

therefore is "whether there is a reasonable probability that, absent the errors, the sentencer ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* In reaching this conclusion, idiosyncracies of the particular jury—including any "propensities toward harshness or leniency"—are irrelevant. *Id.*

¶ 58 Taylor has not shown that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052. According to Taylor, if trial counsel had conducted an adequate mitigation investigation, the jury would have learned that Taylor had "moderate" brain damage, had hit his head several times, had been exposed to farm chemicals, had been a loner and a follower for all of his life, was subject to wide mood swings, and had been a peaceful, loving, nonviolent child. They also may have heard some indication that there was a history of alcohol and substance abuse in Taylor's family. However, if trial counsel had presented this evidence, the jury likely would have heard the State's evidence rebutting Taylor's claims of brain damage. This would likely have included evidence that Taylor has a normal I.Q., as stated by both the Moench and Gummow reports, and that Dr. Moench concluded that Taylor was not mentally ill.

¶ 59 Moreover, the jury would still have heard the testimony of Rolf Tiede and his daughters describing the crime. Among other things, the jury heard Linae Tiede recount her discovery of Taylor and Deli in the cabin and watching them shoot her mother and grandmother; Linae Tiede testify that Taylor told her to stop praying because he worshiped Satan; Rolf Tiede testify about being shot twice and then being doused in gasoline before Taylor and Deli lit the cabin on fire; and Linae and Ticia Tiede detail their ordeal of being kidnapped by Taylor and Deli, forced to help Taylor and Deli steal their father's car, and then taken on a high-speed chase while Taylor and Deli tried to flee from the police.

¶ 60 The State notes that Taylor's claim failed below, in part, because he argued only

that the brain damage evidence was relevant to the statutory mitigating factors that Taylor committed the murders while under the influence of a mental or emotional disturbance or that Taylor did not have the ability to appreciate the wrongfulness of his conduct. *See* Utah Code Ann. § 76–3–207(2)(b), (d) (1990). The State is correct in its assertion that Taylor has not proffered any evidence connecting Dr. Gummow's brain damage diagnosis to his mental state at the time of the crime. He consequently cannot show that trial counsel's failure to raise this issue at the penalty phase prejudiced him in this respect. Furthermore, we do not think that Taylor can show prejudice even with respect to the broader argument that the evidence of brain damage would have won juror sympathy and resulted in a lighter sentence. Given the horrendous circumstances of this crime, it is not at all likely that the jury would have concluded that the mitigating circumstances outweighed the aggravating circumstances. Therefore, counsel's errors do not undermine our confidence in the outcome of the penalty phase.

¶ 61 We likewise conclude that appellate counsel was not ineffective because he failed to challenge trial counsel's mitigation investigation independent of the conflict-of-interest claim and failed to conduct his own mitigation investigation. Had appellate counsel discovered and presented the information proffered by Taylor during the post-conviction proceedings, it is not likely that this court would have found that trial counsel's performance was prejudicial. Thus, Taylor cannot show that he received ineffective assistance of appellate counsel. We therefore affirm the post-conviction court's decision on this issue.

## III. THE JURY INSTRUCTIONS WERE APPROPRIATE

¶ 62 Taylor argues that his appellate counsel should have challenged several of the jury instructions given at the penalty phase. Specifically, he argues that (1) the instruction giving the mitigating factors to the jury was too complicated because each mitigating factor is phrased in the form of "whether" that particular mitigating factor exists; (2) the instruction informing the jurors how to weigh mitigating and aggravating circumstances instructed them to consider "the totality of the evidence produced by the state and the defendant" instead of asking them to determine whether aggravating factors outweighed mitigating factors; (3) the reasonable doubt instruction failed to adequately explain the meaning of that term; (4) the trial court failed to give an instruction that there was a presumption in favor of life and failed to give an instruction explaining the meaning of life in prison; and (5) the trial court did not instruct the jury that life imprisonment was an option but rather instructed the jury only that it could make a unanimous finding of death or return with a verdict that the jury could not reach a unanimous verdict. Taylor also argues that trial counsel was ineffective for failing to object to the instructions and that appellate counsel was ineffective for failing to challenge the instructions or trial counsel's ineffectiveness for failing to object to them.

¶ 63 The post-conviction court held that the jury instructions "fairly and accurately instructed the jury on the law that applied to [Taylor's] case ... [and] trial counsel exercised reasonable professional judgment when he assented without objection to the challenged instructions." Because trial counsel acted reasonably, appellate counsel did not overlook an obvious claim and would not have been able to demonstrate that any errors would have resulted in reversal.

¶ 64 We agree with the post-conviction court's conclusion that Taylor cannot show that the correction of any errors in the instructions would have changed his sentence. When all of the instructions are considered together, it is clear that the jury was "fairly and accurately instructed" on Utah law. The trial court told the jury to consider the mitigating factors listed in the instruction as well as any other fact in mitigation. The court instructed the jury that it must find, beyond a reasonable doubt, that the aggravating factors existed and that they outweighed the mitigating evidence. The court told the jury that the State had the burden of proof. And it instructed the jury that it either had to reach a "unanimous verdict of death" or re-

turn a verdict stating that it could not reach a unanimous verdict, in which case the court was "required to impose a sentence of life imprisonment."

¶ 65 Taylor claims the court should have given the jury an instruction defining the presumption of life, but he has not cited any authority indicating that he was entitled to such an instruction. While his definition of life imprisonment—that "the defendant will be incarcerated ... for the remainder of his natural life, unless and if ever, he is paroled"—may have been a correct definition of the term, a correct statement of law does not automatically entitle a defendant to a jury instruction. Nevertheless, had the jury been given this instruction, we do not think it would have made a difference in the sentence.

¶ 66 Moreover, while Taylor argues the trial court's instructions failed to inform the jury of the meaning of "beyond a reasonable doubt," our review of the record shows that the court read to the jury the following:

> Reasonable doubt ... means a doubt that is based on reason and one which is reasonable in view of all the evidence. It must be a reasonable doubt and not a doubt which is merely fanciful or imaginary or based on wholly speculative possibility. Proof beyond a reasonable doubt is that degree of proof which satisfies the mind, convinces the understanding of those bound to act conscientiously upon it and obviates all reasonable doubt. A reasonable doubt is a doubt which reasonable men and women would entertain, and it must arise from the evidence or lack of evidence in this case.

Taylor cannot prevail on his argument that this instruction was improper because it is inadequately briefed; he fails to explain what parts of the above instruction were inadequate or what the instruction should have said. Furthermore, it does not appear that this instruction was improper at the time it was given. This court approved a nearly identical instruction several years later in *State v. Robertson*, 932 P.2d 1219 (Utah 1997), because the instruction (1) "contained a clear and unambiguous statement that the State's proof must obviate all reasonable doubt"; (2) "did not define reasonable doubt in terms of the more weighty decisions in life"; and (3) "articulated an appropriate definition of reasonable doubt." *Id.* at 1232–33 (internal quotation marks omitted). While *Robertson* has since been overruled and the requirements for proper reasonable doubt instructions have changed, *see State v. Reyes*, 2005 UT 33, ¶¶ 30, 35–38, 116 P.3d 305,[1] Taylor cannot show that the trial court's instruction was incorrect when it was given. Nevertheless, even if it had been inaccurate, we do not think the given instruction prejudiced the outcome of the sentencing proceeding.

¶ 67 Based on the above, Taylor has not shown that he was prejudiced by the jury instructions. Thus, he cannot show that his trial counsel was ineffective for failing to object, and he cannot show that his appellate counsel missed an obvious claim that would have succeeded on appeal.

## IV. THE VOIR DIRE PROCESS WAS ADEQUATE TO ENSURE THE EMPANELMENT OF A FAIR AND IMPARTIAL JURY

¶ 68 Taylor claims that his appellate counsel was ineffective for not challenging trial counsel's failure to prepare and submit proposed voir dire questions and for not challenging the trial court's refusal to let trial counsel ask jurors if they felt it was their job to seek revenge or whether they believed life in prison was a more severe penalty than death. The post-conviction court denied Taylor's claims, holding that the questions the trial court asked the jury "covered all of the relevant subject areas necessary to select a fair and impartial jury."

¶ 69 Under the Fourteenth Amendment to the United States Constitu-

---

1. In *Reyes*, this court abandoned the "obviate all reasonable doubt" requirement, 2005 UT 33, ¶ 30, 116 P.3d 305, and authorized the use of the Federal Judicial Center's "beyond a reasonable doubt" standard as a "safe harbor" instruction, *id.* ¶ 37. However, we noted that the Federal Judicial Center's standard was not the only permissible definition and that other instructions could be used as long as they satisfied the principles announced in *Reyes*. *Id.* ¶ 38.

tion, a defendant is entitled to question jurors about "the relevant subject area of potential bias." *State v. Piansiaksone*, 954 P.2d 861, 867 (Utah 1998) (citing *Mu'Min v. Virginia*, 500 U.S. 415, 431, 111 S.Ct. 1899, 114 L.Ed.2d 493 (1991)). Nevertheless, voir dire may be improper even if it satisfies the Fourteenth Amendment if it does not "enable[ ] litigants and their counsel to intelligently exercise peremptory challenges" and is not conducted in such a way that, to the extent possible, it " 'eliminate[s] bias and prejudice from the trial proceedings.' " *Id.* (quoting *State v. James*, 819 P.2d 781, 798 (Utah 1991)). "Indeed, the fairness of a trial may depend on the right of counsel to ask voir dire questions designed to discover attitudes and biases, both conscious and subconscious, even though [such attitudes] would not have supported a challenge for cause." *Id.* at 867–68 (internal quotation marks omitted).

■■■■ ¶ 70 "The scope and conduct of voir dire examination is within the discretion of the trial judge." *Id.* at 867. We have emphasized that "trial courts should be permissive in allowing voir dire questions and should exercise their discretion in favor of allowing counsel to elicit information from prospective jurors." *Id.* at 868. Nevertheless, "trial judges are not compelled to permit every question that . . . might disclose some basis for counsel to favor or disfavor seating of a particular juror." *Id.* Nor do we think a defendant is entitled to "ask questions in a particular manner." *Id.* at 867 ("[A]s long as the relevant subject area of potential bias was covered, the Fourteenth Amendment was not violated by the failure to ask questions in a particular manner." (citing *Mu'Min*, 500 U.S. at 431, 111 S.Ct. 1899)). Thus, when we review a trial court's voir dire decisions to determine whether the court abused its discretion we ask " 'whether, considering the totality of the questioning, counsel was afforded an adequate opportunity to gain the information necessary to evaluate jurors.' " *Id.* at 868 (quoting *State v. Bishop*, 753 P.2d 439, 448 (Utah 1988)).

■■■ ¶ 71 We conclude that Taylor's trial counsel was given an adequate opportunity to gain the information necessary to evaluate the prospective jurors. While the trial court did not allow trial counsel to ask jurors whether they felt it was their duty to seek revenge or to ask whether they felt life in prison was a more severe penalty than death, the trial court did allow counsel to ask the jurors whether they considered life to be a severe sentence.[2] The jurors also were asked whether they felt death was appropriate in all homicide cases or whether life imprisonment might be appropriate in some cases; whether they could impose the death penalty if the State met its burden and impose life if the State did not; whether they had any concerns about being criticized for either imposing or not imposing the death penalty; whether they knew anything about the crime, the current case, or the Deli case; and whether they had already formed an opinion regarding the appropriate penalty. The above questions not only exposed juror biases regarding the death penalty versus life imprisonment but also gave trial counsel enough information to intelligently exercise his peremptory strikes. We do not believe the trial court abused its discretion by declining to permit trial counsel to ask about whether the jurors believed it was their role to seek revenge or whether they thought life imprisonment was more severe than the death penalty. Because the trial court did not abuse its discretion, appellate counsel was not ineffective for failing to appeal the trial court's decision, and Taylor's claim fails.

¶ 72 We likewise reject Taylor's claim that trial counsel was ineffective for failing to submit proposed voir dire questions to the trial court before jury selection. While this may be prudent in many cases, Taylor has not cited any authority that would require counsel to submit voir dire questions in advance. Moreover, Taylor has not identified the questions that trial counsel should have submitted or the additional information these questions might have uncovered. Therefore, Taylor has not carried his burden to show

---

**2.** While the court permitted trial counsel to ask this question, trial counsel did not ask it to all of the jurors who served in this case.

ineffective assistance with respect to either trial or appellate counsel. We therefore affirm the post-conviction court on this issue.

## V. TRIAL COUNSEL'S PERFORM-ANCE DURING JURY SELEC-TION WAS REASONABLE

¶ 73 Taylor argues that his appellate counsel was ineffective for not challenging trial counsel's ineffectiveness for either failing to request the removal for cause of several jurors or failing to exercise a peremptory strike to remove them. To show that appellate counsel missed an obvious claim by not challenging his trial counsel's performance during jury selection, Taylor must prove that trial counsel's performance fell below an objective standard of reasonable judgment and that counsel's deficient performance was prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Proving that his counsel's performance fell below an objective standard of reasonableness requires Taylor to "rebut the strong presumption that under the circumstances, the challenged action might be considered sound trial strategy." *Carter III*, 2001 UT 96, ¶ 40, 44 P.3d 626 (internal quotation marks omitted). "In the context of jury selection, this is a difficult task" because a defendant must not only overcome the presumption that trial counsel made a conscious choice to keep the juror but also overcome the presumption that trial counsel's decision to keep a juror constituted effective assistance of counsel. *Id.*

¶ 74 We have recognized that evaluating trial counsel's jury selection decisions is "an inherently speculative exercise." *Id.* ¶ 42. This is due, in part, to the fact that "a trial attorney's decisions ... may be based on little more than personal preference," *State v. Litherland*, 2000 UT 76, ¶ 23, 12 P.3d 92, and the fact that we are confined to reviewing a "bare transcript," *Carter III*, 2001 UT 96, ¶ 40, 44 P.3d 626. We do not have the benefit of "observing the juror's demeanor, personality, or interaction with others." *Id.* ¶ 41. Moreover, we have recognized that decisions that appear counterintuitive may in fact be reasonable. "For instance, an attorney may make a reasoned judgment that a

prospective juror's consciousness of, and concern for, his or her own potential bias actually provides a more sure foundation for confidence in that juror's reasoning processes." *Litherland*, 2000 UT 76, ¶ 22, 12 P.3d 92.

¶ 75 While trial counsel's jury selection decisions are presumed to be reasonable, the presumption is not irrebuttable. *Id.* ¶ 25. A defendant may rebut the presumption that trial counsel's decisions were the result of plausibly justifiable conscious choices or preferences by showing

(1) that defense counsel was so inattentive or indifferent during the jury selection process that the failure to remove a prospective juror was not the product of a conscious choice or preference; (2) that a prospective juror expressed bias so strong or unequivocal that no plausibly countervailing subjective preference could justify failure to remove that juror; or (3) that there is some other specific evidence clearly demonstrating that counsel's choice was not plausibly justifiable.

*Id.*

¶ 76 In this case, Taylor claims that his trial counsel was ineffective for either failing to challenge for cause or failing to use a peremptory strike to remove four jurors—Richards, Moore, Jenkins, and Chamberlain. Taylor claims that trial counsel was ineffective for failing to remove the aforementioned jurors both because he was "so inattentive or indifferent" during the selection process that his failure to remove the challenged jurors "was not the product of conscious choice" and because the challenged jurors "expressed bias so strong ... that no plausible countervailing subjective preference could justify failure to remove [them]." To determine whether Taylor's claims have any merit, we assess the information the challenged jurors disclosed during voir dire.

¶ 77 Juror Richards informed the court that prosecutor Robert Adkins (Adkins) had served as his attorney in negotiating a "land contract," but that this was the only association he had ever had with Adkins. The record does not disclose the amount of time that had passed between the land transaction and Taylor's trial. Richards told the court

that the association he had with Adkins concerning the land contract would not prevent him from being impartial. He likewise told the court that he would be willing to vote for life imprisonment if the State failed to satisfy its burden of proof, that he was not worried about being criticized if the jury did not impose the death penalty, that he could follow the court's instructions, and that he had not formed an opinion about the appropriate punishment in this case. Moreover, when questioned about his feelings regarding the death penalty, he replied that he "believe[d] in capital punishment, but it would have to be after the evidence was weighed very heavily without any reasonable doubt." Trial counsel did not challenge Juror Richards for cause.

¶ 78 Juror Moore informed the court that he was "acquainted with Robert Adkins and his family," but that he did not socialize with Adkins. While he disclosed that he worked with Adkins' mother at the LDS Temple, he stated that he could be "fair and impartial" to both the State and Taylor despite the association. When asked about the death penalty, he stated that he "[did not] like to see anybody die," but that there were circumstances that would justify imposing the death penalty. He stated that he would be willing to impose the death penalty if the State satisfied its burden of proof and impose a life sentence if the State failed to meet its burden.

¶ 79 Trial counsel asked follow-up questions regarding Moore's ties to the prosecutor. Specifically, he asked whether Moore felt "independent enough of Mr. Adkins [that he] would not have to explain a decision ...

to him" and whether Moore would be compelled to agree with the State's arguments due to his relationship with Adkins and his family. Moore stated that he would not be influenced by his acquaintance with the Adkins' family and would make an independent decision.

¶ 80 Taylor's trial counsel ultimately did challenge Moore for cause, citing concerns about comments Moore made regarding "the doctrine of blood atonement." The court asked Moore whether he believed in the doctrine of blood atonement, to which he responded affirmatively. However, upon later questioning it became clear that he believed the doctrine of blood atonement referred to the Christian belief that Jesus Christ died for the sins of the world and not to the principle that anyone who kills must be killed. When specifically asked whether he believed that one who kills should be killed, he stated that he thought so and that he was troubled by the prospect of taxpayers paying for the costs associated with a life sentence. The court rehabilitated Moore, however, by asking whether he would impose the death penalty based on the doctrine that one who kills should be killed or based on taxes. Moore responded that he would not impose the death penalty based on those grounds and that he had not formed an opinion about the appropriate penalty in Taylor's case. Based upon that testimony, the State opposed trial counsel's challenge. The trial court agreed with the State and declined to remove Juror Moore for cause. Although he had sought to have him removed for cause, Taylor's trial counsel did not use a peremptory strike to remove Moore.[3]

---

3. Taylor has not argued in this appeal that the trial court erred in passing Moore for cause. Moreover, it does not appear that he could have challenged the trial court's decision where he did not attempt to cure the court's failure to remove Moore by exercising a peremptory strike. *State v. Baker*, 935 P.2d 503, 506 (Utah 1997). Thus, he can claim only that his trial counsel was ineffective for failing to use a peremptory strike to remove Moore.

Rule 18(e) of the Utah Rules of Criminal Procedure provides a list of grounds a court should consider when determining whether to remove a juror for cause. However, the ultimate decision to remove or pass a prospective juror for cause lies within the discretion of the trial court. *See,*

*e.g., State v. Wach,* 2001 UT 35, ¶ 25, 24 P.3d 948 ("[A] trial court's determination of whether to excuse a prospective juror for cause should not be reversed absent an abuse of discretion."). In 2001, rule 18 was amended and an advisory committee note was added to guide courts in exercising their discretion. The current advisory committee note addresses the "tendency of trial court judges to rule against a challenge for cause in the face of legitimate questions about a juror's biases." Utah R.Crim. P. 18 advisory committee note. The advisory committee note cites this court's decision in *State v. Carter (Carter II)*, 888 P.2d 629 (Utah 1995), wherein we stated that we were "perplexed by the trial courts' frequent insistence on passing jurors for cause in death

¶ 81 Juror Jenkins informed the court that he was the director of the Summit County Health Department. He stated that he knew both prosecutors and two of the non-victim fact witnesses either in his current position or in previous positions with Summit County or the state. He stated that Adkins was a "lifelong friend" that he knew from working for Summit County, but that he did not socialize with him or his family. He likewise stated that he did not socialize with prosecutor Christiansen or his family. On appeal, Taylor argues that Jenkins had an attorney-client relationship with Adkins and Christiansen. However, we cannot find any evidence of this in the record. Jenkins did state that he had worked with both prosecutors "on ordinances" in his capacity as the director of the Health Department, but there is no indication that he personally was a client of the prosecutors.

¶ 82 After Jenkins disclosed his connection to the prosecutors, the court asked whether he felt he could take a position contrary to the prosecution without fear of criticism, to which Jenkins responded affirmatively. Jenkins told the court that he did not think his relationship with the prosecutors would prevent him from being fair and impartial, and that he did not feel that he would have to explain his decision to them. He also told the court that he would be willing to impose the death penalty if the State met its burden of proof and to impose a life sentence if the State did not, that he was not worried about being criticized for the jury's decision, and that he had not formed an opinion about what the appropriate penalty would be. Trial counsel did not challenge this juror.

¶ 83 Juror Cheryl Chamberlain disclosed that her cousin was Judge Edward Watson, who presided over the preliminary hearing in this case, and that her son was married to Adkins' sister. No one further explored her connections to the Judge or Adkins, but Chamberlain did state that she would not automatically impose the death penalty in murder cases, that she would be willing to follow the court's instructions, that she would be willing to vote for life imprisonment if the State failed to meet its burden of proof, and that she recognized there might be some deliberate murder cases where death would not be the appropriate penalty. She stated that she thought she might be criticized for either imposing or not imposing the death penalty, but that she would not be bothered by the criticism and that she would not let it influence her decision. When asked if she had heard anything about this case before coming to court, she stated that she had heard about it in the news, but that she had not heard about it from anyone with personal knowledge of it. She did not list either her cousin or her daughter-in-law as sources of information. Moreover, she told the court that she had not formed an opinion about the appropriate penalty based on what she had heard and that she could approach the case with an open mind. Trial counsel did not challenge this juror.

¶ 84 After reviewing the transcript in this case, we agree with the post-conviction court's conclusion that trial counsel's "performance reflected conscious decision-making" and that he did not appear "inattentive, ignorant, [or] indifferent to possible indications of bias." The transcript indicates that throughout voir dire, trial counsel asked questions to collect information about the prospective jurors. With respect to the four challenged jurors, trial counsel asked some or all of them whether they considered life in prison to be a severe sentence, whether they felt like they would be influenced by the fear

penalty cases when legitimate concerns about their suitability have been raised during voir dire" and troubled by trial courts' tendencies to "push the edge of the envelope" in making for-cause determinations. Utah R.Crim. P. 18 advisory committee note (quoting *Carter II*, 888 P.2d 629 (Utah 1995)). In light of the concern expressed in *Carter II*, the advisory committee note instructs judges to allow thorough questioning so that parties have "a meaningful opportunity to explore grounds for challenges for cause" and "encourage[s] judges to exercise greater care in evaluating challenges for cause and to resolve legitimate doubts in favor of removal." Utah R.Crim. P. 18 advisory committee note.

The trial court in Taylor's case did not have the benefit of the advisory committee note. Moreover, in mentioning the committee note, we do not suggest that the trial court abused its discretion in this case. Rather, we mention it to encourage trial courts in future cases, particularly capital cases, to seek guidance from the advisory committee note when asked to remove jurors for cause.

that they would have to explain their decision to someone, whether they felt like their decision would be affected by their connection to the prosecutors, and whether they would be able to keep an open mind regarding the appropriate penalty knowing Taylor deliberately killed two individuals in an unprovoked manner. Trial counsel also asked Juror Jenkins questions specifically relating to his ability to be fair in light of his working relationship with the prosecutors and challenged Juror Moore for cause. This participation defeats Taylor's claim that trial counsel was so "inattentive or indifferent" that the failure to remove the jurors was not the product of a conscious choice or preference.

¶ 85 We likewise agree with the post-conviction court's holding that the four challenged jurors did not "express[ ] bias so strong or unequivocal that no plausible countervailing subjective preference could justify failure to remove that juror." While the four jurors disclosed that they were friends or acquaintances with one or both of the prosecutors, none of the jurors said that they socialized with them. Moreover, they all stated that they could be open-minded and that their connection to one or both of the prosecutors or the prosecutors' family members would not influence their decision. They all stated that they would be willing to follow the court's instructions, weigh the evidence, and impose a life sentence if the State failed to satisfy its burden of proof. Each one also agreed that there may be circumstances in which a defendant who deliberately killed another person might not deserve the death penalty. Based on the four jurors' statements in the transcript regarding their abilities to be fair and open-minded, we do not think that any of them "indicated the sort of strong or unequivocal bias that would mandate their removal from the jury." *Litherland*, 2000 UT 76, ¶ 28, 12 P.3d 92.

¶ 86 Furthermore, a couple of the jurors made statements indicating that they were less likely to be biased toward death than other jurors may have been. Juror Richards stated that he believed in capital punishment only "after the evidence was weighed very heavily and without any reasonable doubt," and Juror Moore stated that he "[did not]

like to see anybody die." While Moore did state that he believed in the doctrine of blood atonement, after further questioning it became clear that he did not understand what the court meant by that term. Likewise, he retreated from his comment that he did not like to see taxpayers carry the financial burden associated with life in prison by affirming that he would not vote for or against the death penalty based on tax considerations. We therefore cannot conclude that trial counsel had no strategic reasons for keeping Richards and Moore and instead exercising his peremptory strikes on other jurors.

¶ 87 Because Taylor failed to show that counsel was indifferent, to demonstrate that the jurors were so unequivocally biased that no plausible preference could justify not removing them, or to provide any other specific evidence "clearly demonstrating that counsel's choice was not plausibly justifiable," *Litherland*, 2000 UT 76, ¶ 25, 12 P.3d 92, he has not overcome the presumption that counsel was acting reasonably and his claim fails. We thus do not need to reach the prejudice part of the *Strickland* test. We likewise need not address Taylor's arguments concerning the alternate or other prospective jurors.

¶ 88 Moreover, because we conclude that trial counsel did not perform deficiently during the jury selection process, we cannot hold that appellate counsel missed an obvious claim that would have led to a different result on appeal. We therefore reject Taylor's claim that his appellate counsel was ineffective for failing to challenge his trial counsel's conduct with respect to jury selection.

## VI. THE LOWER COURT DID NOT ERR IN NOT ORDERING A COMPETENCY EVALUATION AT SENTENCING AND AT THE RULE 23B HEARING

¶ 89 Taylor argues that his appellate counsel should have argued that (1) his trial counsel was ineffective for failing to file a motion to determine competency and that the trial court erred in failing to instigate competency proceedings; and (2) the rule 23B court erred in failing to grant appellate counsel's motion to initiate a competency evalua-

tion to determine whether Taylor was competent to proceed. We address each claim in turn.

### A. Taylor Has Not Shown Trial Counsel Was Ineffective for Failing to File a Competency Motion at the Penalty Phase

¶ 90 Taylor slit his wrists in an apparent suicide attempt on the morning of the first day of the penalty phase. The penalty proceeding was delayed so that Taylor could obtain medical treatment for his cuts, which apparently resulted only in the loss of a minor amount of blood. In the meantime, the trial court contacted Dr. Mark Rindflesh, one of the psychiatrists who had already examined Taylor to determine whether he met the test for insanity, to examine Taylor again and determine whether he was competent to proceed. Dr. Rindflesh concluded that Taylor was competent to proceed. Dr. Rindflesh opined that Taylor was "certainly capable" of assisting his counsel even if Taylor chose not to aid in his defense. Dr. Rindflesh also told the court that he "ha[d] no question" that Taylor would be able to understand the nature of the proceedings against him because Taylor had been able to weigh all of the implications of the possible penalties. Finally, Dr. Rindflesh testified that while Taylor was depressed, "the severity of the depression [was] not so great that it render[ed] him incompetent in the eyes of the court."

¶ 91 Taylor's trial counsel also spoke to the court regarding Taylor's competency. Trial counsel told the court that he had been with Taylor for the four hours prior to Dr. Rindflesh's arrival. During this four-hour period, trial counsel and Taylor were "involved in extensive discussions on a variety of issues." Based on these discussions, trial counsel told the court that he was "satisfied that Mr. Taylor [was] aware of what [was] going on" and that he believed Taylor was competent to assist him in the presentation of evidence. Trial counsel did not request a competency hearing and told the court that he was "comfortable ... that [the court] could now proceed at any time with the penalty phase."

¶ 92 Under the Due Process Clause of the United States Constitution, "only competent defendants are required to stand trial." *State v. Young*, 780 P.2d 1233, 1236 (Utah 1989) (citing *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) (per curiam)). A defendant is considered competent if "the defendant has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and has a rational as well as a factual understanding of the proceedings against him." *Jacobs v. State*, 2001 UT 17, ¶ 12, 20 P.3d 382 (citations and internal quotation marks omitted).

¶ 93 "A trial court must hold a competency hearing when there is a substantial question of possible doubt as to a defendant's competency at the time of the guilty plea." *Id.* ¶ 13 (citations and internal quotation marks omitted). When determining whether there was a substantial question of possible doubt, we look to "what the trial court did in light of what it then knew of the defendant." *Young*, 780 P.2d at 1237 (citation omitted). We have noted, however, that

> "[f]itness to stand trial is a much narrower concept than moral or social wellness, and thus the fact that a defendant is twisted and disturbed does not necessarily mean he is unfit for trial. The fact that a person is mentally ill, displays bizarre, volatile, and irrational behavior, or has a history of mental illness, does not mean that he or she is incompetent to stand trial. A defendant may be fit for trial even though his mind is otherwise unsound."

*Jacobs*, 2001 UT 17, ¶ 16, 20 P.3d 382 (quoting 21 Am.Jur.2d *Criminal Law* § 97 (1998) (footnotes omitted)).

¶ 94 Based on our review of the record, we do not think that there was a "substantial question of possible doubt" regarding Taylor's competency. The court heard testimony from a psychiatrist who had evaluated Taylor following the suicide attempt and concluded that Taylor was able to understand the nature of the penalty proceeding and the implications of its possible outcomes and that Taylor had the ability to assist counsel if he chose to do so. This testimony was corroborated by trial counsel. While the suicide

attempt indicated that Taylor was depressed, depression does not necessarily indicate that Taylor was not competent. Thus, Taylor cannot show that the trial court erred in failing to order a competency proceeding.

¶ 95 We likewise reject Taylor's claim that trial counsel was ineffective for failing to request a competency hearing. Trial counsel could reasonably rely on his own extensive interactions with Taylor and on Dr. Rindflesh's testimony that Taylor was competent. Moreover, Taylor has not offered any evidence to show that, had a competency hearing been requested and granted, the court would have found evidence of incompetence. He also has not argued that he was incompetent at any point during the proceedings. He therefore has not demonstrated how he was prejudiced by trial counsel's failure to request such a proceeding.

¶ 96 Given our holding that the trial court did not err in not ordering a competency evaluation, Taylor cannot succeed on his claim that appellate counsel was ineffective for failing to raise this issue on appeal.

### B. The 23B Court Did Not Err in Denying Appellate Counsel's Motion for a Competency Evaluation

■ ¶ 97 The issue of Taylor's competence was also raised in the judge's chambers during the ineffective assistance of counsel hearing under rule 23B of the Utah Rules of Appellate Procedure. Midway through the 23B hearing, appellate counsel was notified by the prison that Taylor "no longer wished to be brought to the [courthouse] and that he wasn't [going to] return[ ]." Taylor reiterated this intention to appellate counsel when appellate counsel met with Taylor. When appellate counsel asked whether Taylor wanted to go forward with the rule 23B proceeding, Taylor stated, "I'm too depressed. I'm too depressed. I can't do this anymore." Appellate counsel told the court that because Taylor was not being responsive he did not have a clear picture of whether Taylor wanted to proceed with the rule 23B hearing or whether he knew he could appeal without having a rule 23B hearing.

¶ 98 The 23B court instructed appellate counsel to speak with Taylor again and determine (1) whether Taylor was refusing to come to court; (2) whether Taylor still wanted the rule 23B hearing to go forward; and (3) whether Taylor would be willing to come into court long enough for the court to ask him some questions regarding whether to continue the proceeding.

¶ 99 When the in-chambers conference reconvened, Taylor's appellate counsel informed the court that Taylor was able to respond clearly to several of his questions. He also told the court that Taylor was willing to answer the court's questions and that Taylor had told him he wanted the 23B hearing to move forward, but that he did not want to be present. Taylor also told his appellate counsel that he did not want to return the next day, but that he knew the prison would make him.

¶ 100 The 23B judge then questioned Taylor in open court. Taylor appropriately responded to all but two of the judge's questions. For example, Taylor answered the judge's questions regarding whether he desired to return to court, whether he had discussed his desire with his attorney, and whether he was cold in the courtroom. Taylor also stated, in response to questions, that he would "[prefer not] to attend" the proceeding, that he would "rather these proceedings not be dismissed, but [he didn't] know if [he would] attend," and that he was cold in the courtroom but could not wear his sweatshirt "according to prison policy." When asked if being cold was the only reason he did not want to attend the proceeding, he responded, "This hearing depresses me."

¶ 101 The record reveals that Taylor did not respond to two of the judge's questions. The first question was whether he understood that if he did not return to court the State would likely move to dismiss the rule 23B hearing. The record indicates that when the judge asked this question, Taylor turned to look at his counsel. Counsel then revealed that he had told Taylor to ask him if he did not understand any of the judge's questions. The judge then attempted to explain the question more clearly. This time, Taylor responded that he understood. When asked whether he had any questions, Taylor

did not respond, but indicated that he wished to speak to his counsel. Taylor and his counsel had an off-record discussion, following which counsel asked, on Taylor's behalf, whether it was possible for Taylor to waive his right to be present.

¶ 102 After the meeting in open court, the parties again met with the judge in chambers. At this time, Taylor's counsel filed a motion to inquire into Taylor's sanity. The 23B court denied the motion, concluding that Utah Code section 77–15–5, which governs staying proceedings when a petition of incompetency is filed, did not require the court to stay a rule 23B hearing due to a competency claim. Specifically, the judge noted that the rule 23B hearing was being conducted at Taylor's request, that the rule 23B proceeding was not a prosecutorial proceeding against Taylor, and that Taylor bore the burden of proof on the allegations that he received ineffective assistance of counsel. The judge further noted the following:

> That the Court has observed Mr. Taylor throughout this proceeding, has found him to appear alert, composed; that he has been discussing matters with counsel at counsel table; has been taking notes. He's had colloquy with the Court. In that colloquy with the Court, he was responsive, appeared to understand the matters discussed and to make his wishes known to the Court.

¶ 103 During this final in-chambers meeting, Taylor told his counsel that he had changed his mind and that he wished to remain and return to the court so that the rule 23B proceedings could continue. When questioned by the judge, he told the judge that he did indeed wish to be present, that his attorney had advised him that he had a right to be here, and that he had been advised to notify the court if he was uncomfortable for any reason and the court would try to accommodate him. Taylor did not, however, withdraw his competency motion.

¶ 104 Taylor argues that the 23B court erred in denying his counsel's motion for a competency evaluation and that appellate counsel erred in not raising this issue on appeal. Taylor's claims fail, however, because Taylor did not raise them in his Amended Petition for Post–Conviction Relief. He raised them for the first time in this appeal. This court generally does not address claims that have been raised for the first time on appeal. *State v. Winfield,* 2006 UT 4, ¶ 23, 128 P.3d 1171. "In capital cases, however, this court will review issues not raised below for plain error, unless the defendant invited the error at trial." *State v. Arguelles,* 2003 UT 1, ¶ 41, 63 P.3d 731.

¶ 105 Here, Taylor does not argue that the 23B court committed plain error in denying Taylor's petition for a competency evaluation. Nor do we believe he would have succeeded on such a claim because Taylor's behavior did not raise "a substantial question of possible doubt" regarding his competency. *Jacobs,* 2001 UT 17, ¶ 13, 20 P.3d 382. From the record, it appears that Taylor was able to respond to the 23B court's questions and able to consult with his attorney. The judge observed that Taylor was alert and composed, was discussing matters with counsel and taking notes, was responsive during the court's colloquy, and was able to make his wishes known to the court. We therefore conclude that the 23B court did not commit plain error in denying Taylor's motion for a competency evaluation. As a result, Taylor cannot prevail on his claim that appellate counsel was ineffective for failing to challenge the 23B court's decision on appeal.

## VII. THE TRIAL COURT'S ADMISSION OF THE SCOTT MANLEY TAPE DID NOT VIOLATE TAYLOR'S CONSTITUTIONAL RIGHTS

¶ 106 Taylor asserts that appellate counsel was ineffective for failing to argue that his rights to due process and confrontation were violated at sentencing by the admission of a recorded statement by Scott Manley. While Taylor was at the Tiede cabin, he telephoned Manley, an inmate at the halfway house from which Taylor had escaped. At the penalty phase, the State called Manley as a witness to relate the contents of their conversation. Manley refused to testify because he was in prison and did not want to be viewed as a snitch. As a result, the State played a taped statement that Manley made to the police

shortly after the murders. On the tape, Manley stated that Taylor had called him and told him that he was at a cabin waiting to steal a car. When Manley asked Taylor what he would do if the cabin's occupants returned, Taylor allegedly responded, "[W]ho cares, they're wasted."

¶ 107 Trial counsel objected to the admission of the recording, arguing that it was hearsay and unfairly prejudicial. The trial court noted that the tape "may [have] fit within an exception to the hearsay rule ... but even at that, ... the court [was] at liberty to introduce evidence that is probative of the issues in a penalty hearing." Therefore, the court allowed the tape to be entered into evidence. Trial counsel then preserved his objection, stating that he objected on the grounds of hearsay, the Sixth Amendment to the United States Constitution, and article I, section 12 of the Utah Constitution. At closing argument, the State referred to the tape to argue that the murders had been premeditated and argued that the tape was "the most significant [evidence]" the jury had heard. Although trial counsel preserved his objection to the tape, appellate counsel did not raise this issue on appeal. The post-conviction court denied Taylor's claim that appellate counsel was ineffective, holding that the tape's admission was not erroneous and that any error in its admission would have been harmless.

■■■ ¶ 108 Like the post-conviction court, we disagree with Taylor's claim that appellate counsel was ineffective for failing to challenge the sentencing court's admission of the tape. When Taylor filed his appeal, hearsay evidence generally was considered to be admissible at sentencing. *See* Utah Code Ann. § 76–3–207(2)(b) (1996) (stating that in a capital sentencing proceeding, "[a]ny evidence the court considers to have probative force may be received regardless of its admissibility under the exclusionary rules of evidence"). All that was required was that the hearsay be reliable and that the defendant be given the opportunity to rebut the evidence. *See State v. Carter (Carter II )*, 888 P.2d 629, 646 (Utah 1995), *superseded on other grounds by* Utah Code Ann. § 76–3–207(2)(a)(iii) (1999) (stating that transcript of prior testimony may not be read into evidence at a capital sentencing phase unless the party proffering the evidence can show the witness was unavailable and "demonstrate that the unavailable witness's prior testimony bears sufficient indicia of reliability"), *superseded by statute on other grounds*, Crime Victim Rights Amendments, ch. 352, § 5, 1995 Utah Laws 1363; *State v. Sanwick*, 713 P.2d 707, 709 (Utah 1986) (recognizing that hearsay evidence is generally admissible at sentencing proceedings, but holding that the defendant must be given the opportunity to rebut any hearsay evidence presented). If the hearsay evidence satisfied both requirements, it was not deemed to be a violation of either the Due Process Clause or the Confrontation Clause.[4] *See, e.g., United States*

---

4. The United States Supreme Court's decision in *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), which held that testimonial hearsay is not admissible at the guilt phase of trial without "unavailability and a prior opportunity for cross-examination," has triggered some debate as to whether confrontation rights apply to sentencing. *Id.* at 68, 124 S.Ct. 1354. At least one court has suggested that the right to confrontation may apply to capital sentencing proceedings. *See United States v. Brown*, 441 F.3d 1330, 1361 & n. 12 (11th Cir.2006) (noting that *Crawford* does not apply in the non-capital sentencing context, but hinting that, if given the opportunity, it may hold that the right to cross-examine witnesses applies to capital sentencing hearings based on its belief that "death is different" and on its prior holding in the state habeas context that "the constitutional right to cross-examine witnesses applies to capital sentencing hearings" (citation omitted)); *see also* John G. Douglass, *Confronting Death: Sixth*

*Amendment Rights at Capital Sentencing*, 105 Colum. L.Rev.1967 (2005) (positing the theory that following the Court's decisions in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), and *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), all the Sixth Amendment guarantees, including confrontation, apply to sentencing). However, most federal courts have maintained their pre-*Crawford* positions that neither the Confrontation Clause nor the Due Process Clause requires confrontation at sentencing. *See, e.g., United States v. Katzopoulos*, 437 F.3d 569, 576 (6th Cir.2006) (stating that nothing in *Crawford* required the court to "reverse its long-settled rule of law that the Confrontation Clause permits the admission of testimonial hearsay evidence at sentencing proceedings"); *United States*

*v. Katzopoulos,* 437 F.3d 569, 574 (6th Cir. 2006) (stating that before the United States Supreme Court issued *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), it was "well settled" that "testimonial hearsay was admissible at sentencing if it bore some minimum *indicia* of reliability").

¶ 109 Thus, appellate counsel did not miss an obvious claim at the time he filed Taylor's first appeal because, although it was hearsay, the Manley testimony would have been admissible as long as it was reliable and Taylor had been given the opportunity to rebut the evidence. Taylor was given the opportunity to rebut the evidence at sentencing. He took the stand and told the jury that he did not tell Manley that he and Deli were planning to steal a car or that they were going to shoot or waste anybody.

¶ 110 Moreover, Manley's testimony was not obviously unreliable. Taylor argues that Manley's statement was unreliable because Manley was a suspected accomplice. Specifically, Taylor's brief states that when the police contacted the supervising parole officer at the halfway house, "she . . . told [the] police that Mr. Manley might somehow be involved in the incident that occurred at the Tiede cabin either because he was with Mr. Taylor or might have provided the firearm to Mr. Taylor." The record does not support this assertion. Our review of the record reveals that the parole officer did not tell the police that Manley was a suspected accomplice, but that she told the officer that "Taylor may have been in the company of two individuals and provided the names of Scott Manley" and one other parolee. She also indicated that another probation officer had "spoken to Manley about having a firearm in the last little while but [had no] idea what developed there." These statements do not suggest that Manley was with Taylor at the time of the crime or that he supplied Taylor with the murder weapon. It does not appear that Manley was ever treated as a suspected accomplice to this crime. Moreover, while Manley was suspected of a parole violation

for having a firearm in violation of the terms of his parole and was an inmate at the halfway house, these facts do not make his testimony so unreliable that it was a "dead-bang winner on appeal."

¶ 111 Moreover, even if Manley's testimony was unreliable, any error the court made in admitting the tape was harmless. The Manley tape was not the only evidence of premeditation in this case. The State also offered evidence that Taylor and Deli had seen the Tiedes earlier in the week and knew the cabin was occupied, that they waited at the cabin for twelve hours before the Tiedes returned, that they made a video recording while at the cabin, and that they saw unopened Christmas presents, suggesting the family would return since it was only four days before Christmas. Furthermore, the jury was presented with many aggravating factors besides premeditation, including attempted murder, kidnaping, arson, theft, and a high-speed flight from police. Thus, the admission of the Manley statement does not undermine our confidence in the result of the sentencing proceeding. As a result, Taylor cannot show that his appellate counsel's performance was deficient because he missed an obvious claim.

## VIII. THE PROSECUTOR DID NOT COMMIT MISCONDUCT

¶ 112 Taylor claims that his appellate counsel was ineffective for failing to claim prosecutorial misconduct. He alleges that the prosecutors committed misconduct because they discussed inadmissible evidence and called the jury's attention to evidence that it could not properly consider when reaching its verdict. Taylor points to (1) the prosecution's objections to trial counsel's attempts to ask jurors to compare the seriousness between a life and death sentence and to trial counsel's questions about the Deli case; (2) the prosecution's question to the medical examiner asking him to rate this homicide "using a one to ten 'grossness' scale" and the prosecutor's use of this assessment at closing

*v. Luciano,* 414 F.3d 174, 179 (1st Cir.2005) (holding that *Crawford* did not require the alteration of the court's previous conclusion that "there is no Sixth Amendment Confrontation

Clause right at sentencing"). Because we assess appellate counsel's performance as of the time he decided what issues to appeal, we need not address this issue here.

argument; (3) the prosecution's use of the Manley tape to argue that the killings were premeditated; (4) the prosecution's suggestion at closing argument that death was the only appropriate penalty because Taylor might escape from prison; and (5) the prosecution's instructions to the jury, at both opening and closing arguments, that the jury did not have to find Taylor guilty of the dismissed offenses to consider them aggravating circumstances.

▬▬▬ ¶ 113 "Prosecutorial misconduct occurs when the prosecutor's comments call the jurors' attention to matters not proper for their consideration and when the comments have a reasonable likelihood of prejudicing the jury by significantly influencing its verdict." *State v. Reed*, 2000 UT 68, ¶ 18, 8 P.3d 1025. We reverse only when "the prejudice is such that there is a reasonable likelihood the jury would have reached a more favorable result absent the comments." *Id.*

▬▬▬ ¶ 114 Taylor cannot show that either the prosecutor's conduct rose to the level of plain error or appellate counsel missed an obvious claim. A prosecutor does not commit misconduct by objecting to trial counsel's voir dire questions. Rather, the prosecutor's objections in this case were part of normal trial procedure. Moreover, the objections were not made before the empaneled jury, but before only a few individual jurors and the judge during the individual voir dire proceedings. Similarly, the prosecutor in this case did not commit misconduct by referring to the Manley tape. The Manley tape had been admitted into evidence at the sentencing phase. As we discussed in section VII, this was not erroneous. Thus, the prosecutor did not refer the jury "to matters not proper for their consideration" by calling attention to it or its strength as evidence of premeditation during closing arguments. *Id.*

▬▬▬ ¶ 115 Taylor likewise cannot show the prosecutor committed misconduct when he stated in his closing argument that Taylor posed an escape risk because he had escaped from the halfway house. After the prosecutor made this comment, Taylor's trial counsel promptly objected and the trial court sustained the objection, instructing the jurors

that they should disregard the prosecutor's statement. When a court sustains an objection and gives a curative instruction, a defendant must show that "the [prosecutor's] comment was so prejudicial as to defeat the mitigating effect of the court's . . . curative instructions." *State v. Kohl*, 2000 UT 35, ¶ 24, 999 P.2d 7. In this case, Taylor has not shown that the comment defeated the mitigating effect of the instruction. Indeed, his brief fails to mention that his trial counsel objected to the comment or that the court sustained the objection and gave the jury a curative instruction. In any event, we do not think that the prosecutor's comment influenced the jury's decision in light of the other aggravating factors.

¶ 116 Finally, Taylor cannot show that the prosecutor's questions about and reference to the "grossness scale" or the prosecutor's inaccurate instructions regarding the State's burden to prove aggravating factors warrant concluding that, but for the prosecutor's misconduct, there is a reasonable likelihood that the penalty phase outcome would have been different. While the prosecutor may have misstated the burden of proof, the trial court correctly instructed the jury that it must unanimously find that "the prosecution has proven all elements of [the aggravating crime] beyond a reasonable doubt." Given the victims' testimonies describing the horrendous nature of the crimes in this case and identifying Taylor as one of the perpetrators, we do not think that the prosecutor's comments influenced the jury's decision.

¶ 117 We therefore conclude that the court did not commit plain error by allowing the prosecutor to make the challenged statements and that appellate counsel did not miss an obvious claim on appeal.

## IX. TAYLOR'S DEATH SENTENCE IS NOT UNCONSTITUTIONAL

¶ 118 Taylor claims his appellate counsel was ineffective for failing to raise various challenges to the death penalty. He argues that both trial and appellate counsel were ineffective because they did not argue that (1) the death penalty statute under which Taylor was sentenced in 1991 violated the due process and equal protection clauses un-

der both the state and federal constitutions because it failed to narrow the class of death-eligible defendants, and (2) Taylor's death sentence is cruel and unusual punishment given that many other countries have abolished the death penalty. Taylor also argues, for the first time in this appeal, that his death sentence is unconstitutional because his trial counsel had a conflict of interest due to his simultaneous representation of two death penalty defendants.

### A. Appellate Counsel Was Not Ineffective for Failing to Challenge the Death Penalty

¶ 119 Appellate counsel's failure to challenge the constitutionality of the 1991 death penalty statute or the constitutionality of the death penalty itself did not constitute ineffective assistance of counsel. To effectively represent a defendant, appellate counsel need not "raise every nonfrivolous issue on appeal." *Carter III*, 2001 UT 96, ¶ 48, 44 P.3d 626. Rather, counsel may use his or her professional judgment and decide to raise only those claims most likely to succeed. *See id.* (noting that "counsel frequently will 'winnow out' weaker claims in order to focus effectively on those more likely to prevail" (citation omitted)). This is true even in capital cases. *See id.* Accordingly, we do not think that an appellate attorney must always challenge the constitutionality of the death penalty in order to effectively represent his or her client. This does not foreclose the possibility, however, that there are cases in which the failure to raise such a challenge would amount to ineffective assistance.

¶ 120 We do not think that this is one of those cases. In 1993, two years after Taylor had been sentenced, this court issued *State v. Young*, 853 P.2d 327 (Utah 1993). In that case, a majority of the court upheld the state and federal constitutionality of Utah's death penalty statutes, *id.* at 337–38, thus rejecting the defendant's claims that, among other things, Utah's death penalty scheme "constitute[d] cruel and unusual punishment" and

failed to "narrow the class of offenders eligible for the death penalty," *id.* at 336. Considering the fact that *Young* was issued only three years before Taylor filed his first appeal, we do not think that appellate counsel was ineffective for failing to raise the constitutionality of the death penalty on appeal because he could reasonably have concluded that such a claim would not succeed.

¶ 121 We likewise decline to address the merits of Taylor's claims that the death penalty is unconstitutional because it violates the due process and equal protection clauses and because it is cruel and unusual punishment. We have addressed the constitutionality of the death penalty on numerous occasions, each time concluding that the death penalty is constitutional. *See, e.g., State v. Kell*, 2002 UT 106, ¶¶ 58–59, 61 P.3d 1019 (declining to address the defendant's challenge that the death penalty statute was unconstitutional because it failed to narrow the class of death eligible defendants because the issue had been addressed many times before); *State v. Lafferty*, 2001 UT 19, ¶¶ 113–41, 20 P.3d 342 (concluding that the death penalty statute is constitutional); *State v. Lovell*, 1999 UT 40, ¶ 38, 984 P.2d 382 (recognizing that Utah's death penalty scheme had been upheld by both this court and the Tenth Circuit Court of Appeals and therefore declining to readdress its constitutionality); *State v. Young*, 853 P.2d 327, 336–38 (Utah 1993) (upholding Utah's death penalty statute);[5] *State v. Holland*, 777 P.2d 1019, 1028 (Utah 1989) (holding that Utah's death penalty statute narrowed the numbers of those who may be sentenced to death in accordance with the Eighth Amendment to the United States Constitution). Taylor has not presented any novel theory in this appeal that persuades us that we should readdress the constitutionality of either the death penalty or Utah's sentencing scheme.

### B. Taylor's Constitutional Right to Counsel Was Not Violated Because He Has Not Shown That Trial Counsel Had a Conflict of Interest

¶ 122 Finally, Taylor argues that he was denied his constitutional right to effec-

---

5. This author still subscribes to the view expressed in her dissent in *State v. Young*, which argued that the death penalty statute is unconsti-

tutional because it fails to narrow the class of death-eligible defendants. 853 P.2d at 397–403 (Durham, J., dissenting).

tive assistance of counsel because his trial counsel had a conflict of interest. Specifically, Taylor claims that his trial counsel had a conflict of interest because his trial counsel was simultaneously representing Taylor and James Holland, the death row inmate who testified as part of trial counsel's mitigation strategy in Taylor's case. Taylor does not argue that his appellate counsel was ineffective for failing to raise this claim, but rather asks this court to address it pursuant to the unusual circumstances test. Under the unusual circumstances test, we will address claims that are procedurally barred if the petitioner can show "that there was an obvious injustice or a substantial and prejudicial denial of a constitutional right." *Carter III*, 2001 UT 96, ¶ 15, 44 P.3d 626 (internal quotation marks omitted). Taylor has not made that showing here.

¶ 123 The right to effective assistance of counsel includes the "right to counsel free from conflicts of interest." *Taylor I*, 947 P.2d 681, 686 (Utah 1997) (internal quotation marks omitted). Where counsel's alleged conflicts were never raised at trial, a defendant who claims his counsel had a conflict of interest must show that "an actual conflict of interest adversely affected his lawyer's performance." *Id.* (internal quotation marks omitted); *see also United States v. Alvarez*, 137 F.3d 1249, 1251 (10th Cir.1998).

¶ 124 "An actual conflict of interest results if counsel was forced to make choices advancing other interests to the detriment of his client." *Alvarez*, 137 F.3d at 1252. While we have stated that "[i]n order to establish an actual conflict, [a defendant] must demonstrate . . . that the defense attorney was required to make a choice advancing his own interests to the detriment of his client's interests," *Taylor I*, 947 P.2d at 686 (internal quotation marks omitted), we have also found a conflict of interest where defense counsel took a position "that was directly contrary to [the defendant's] interest," *State v. Holland*, 876 P.2d 357, 360 (Utah 1994). For example, in *Holland*, this court disqualified Holland's trial counsel, who also was trial counsel in this case, from representing Holland because trial counsel stopped advocating for Holland when he called Hol-

land to the stand at Taylor's trial to show that Holland was "a prime candidate for the death penalty." *Id.*

¶ 125 Despite trial counsel's conflict-based disqualification in the *Holland* case, Taylor has not pointed us to any evidence suggesting that trial counsel ever acted to advance interests other than Taylor's. We agree that trial counsel improperly called Holland to testify at Taylor's sentencing hearing. Nevertheless, this poor decision does not show that trial counsel was acting to further any interests other than Taylor's. He most certainly was not acting to further Holland's interests. Moreover, trial counsel's simultaneous representation of two capital defendants does not, on its own, create a conflict of interest.

¶ 126 Taylor relies on his other points of appeal to further support his argument that trial counsel had a conflict of interest. However, Taylor never identifies the ulterior interest he believes trial counsel was serving or connects the alleged deficiencies to anything other than poor lawyering. We therefore decline to hold that trial counsel had an actual conflict that impaired his representation of Taylor. Taylor's claim fails under the unusual circumstances test.

### CONCLUSION

¶ 127 We conclude that appellate counsel did not provide ineffective assistance by missing any obvious claims that likely would have resulted in a different outcome on appeal. We likewise conclude that no substantial injustice has been committed. We therefore affirm the post-conviction court's decision to grant summary judgment to the State.

¶ 128 Associate Chief Justice WILKINS, Justice DURRANT, Justice PARRISH, and Justice NEHRING concur in Chief Justice DURHAM'S opinion.