**2013 UT App 71**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,

*Plaintiff, Appellant, and Cross-appellee,*

*v.*

ANDY RASABOUT,

*Defendant and Appellee,*
*and*
LEVITZ LONDON KAYKEO,
*Defendant, Appellee, and Cross-appellant.*

Opinion
No. 20100284-CA
Filed March 21, 2013

Third District, West Jordan Department
The Honorable Robert Adkins
No. 071402384 & 071402387

John E. Swallow and Ryan D. Tenney, Attorneys for Appellant
and Cross-appellee

Debra M. Nelson and Daniel M. Torrence, Attorneys for
Appellee Andy Rasabout

Kelly Ann Booth, Attorney for Appellee and Cross-appellant
Levitz London Kaykeo

JUDGE J. FREDERIC VOROS JR. authored this Opinion,
in which JUDGE WILLIAM A. THORNE JR. concurred.
JUDGE GREGORY K. ORME concurred in part and concurred in the
result in part, with opinion.

VOROS, Judge:

¶1 Following a jury trial, Andy Rasabout and Levitz London
Kaykeo (collectively, Defendants) were each convicted of one count

of possession of alcohol by a minor, a class B misdemeanor, *see* Utah Code Ann. § 32A-12-209 (LexisNexis Supp. 2007) (current version at *id.* § 32B-4-409 (2011)), and twelve counts of discharge of a firearm from a vehicle, a third degree felony, *see id.* § 76-10-508 (Supp. 2007) (current version at *id.* §§ 76-10-508, -508.1 (2012)). Before sentencing, the trial court merged the twelve counts of discharge of a firearm into a single count for each defendant. The State appeals that decision. Kaykeo cross-appeals, challenging his conviction on the basis of ineffective assistance of counsel. We reverse and remand for resentencing on the first issue and affirm on the second.

BACKGROUND[1]

¶2      In the early hours of the morning on November 1, 2007, a man standing outside his house smoking a cigarette saw a white Honda Civic drive past, make a U-turn, and circle back toward him. When he heard a shot fired from the car, he ducked inside the house. He then heard another "eight or nine shots" fired "one right after another, just nonstop." After the car had gone, he ran through the house to check on his family and friends. As he looked out the window moments later, he saw the car drive by again and heard two more shots. No one was injured, but the twelve shots damaged the interior and exterior of the house and two cars parked outside. One of the cars was a distinctive vehicle that belonged to a guest who was at the house that morning.

¶3      Police arrived in minutes. While one officer was outside the house, he saw Defendants drive by in a white Honda Civic,

---

1. "On appeal, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly. We present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Holgate,* 2000 UT 74, ¶ 2, 10 P.3d 346 (citation and internal quotation marks omitted).

followed by a BMW. The officer got into his car and pulled Defendants over. Both the driver of the Civic, Kaykeo, and the passenger, Rasabout, showed signs that they had been drinking. The officer also noticed shell casings in plain view in the passenger compartment of the Civic. After the car was impounded and searched, a nine-millimeter semiautomatic handgun with an empty magazine was found hidden in a compartment under the glove box, and four nine-millimeter shell casings were found in the passenger compartment. Eight additional nine-millimeter shell casings were found near the house.

¶4      Kaykeo presented an alibi at trial, testifying that he was at a party at the time of the shooting. According to Kaykeo's testimony, Rasabout approached Kaykeo at the party and asked him to drive Rasabout home because he had drunk too much. They were pulled over within a few minutes of leaving the party. Kaykeo called no other witnesses to corroborate his alibi.

¶5      The jury returned a verdict of guilty on all counts against Defendants. Before sentencing, the trial court granted a motion to merge convictions. The court merged the twelve counts of discharge of a firearm from a vehicle into a single count for each defendant.

¶6      After sentencing, Kaykeo filed a motion for new trial, arguing that his trial counsel was ineffective because he did not investigate possible witnesses who could verify Kaykeo's alibi. Kaykeo supported his motion with signed declarations from himself and two friends. The State opposed the motion for new trial and filed an affidavit from Kaykeo's trial attorney countering the assertions in Kaykeo's declaration. The trial court found Kaykeo's declaration not credible, found his trial attorney's affidavit credible, and accordingly rejected Kaykeo's ineffective assistance claim.

ISSUES AND STANDARDS OF REVIEW

¶7     On appeal, the State contends that the trial court erred by merging the counts of discharging a firearm from a vehicle. "Because merger questions are legal in nature, we review them for correctness." *State v. Lee*, 2006 UT 5, ¶ 26, 128 P.3d 1179.

¶8     On cross-appeal, Kaykeo challenges his conviction, arguing that he was deprived of his constitutional right to counsel because his trial counsel was ineffective. An ineffective assistance claim presents mixed questions of law and fact. *State v. Templin*, 805 P.2d 182, 186 (Utah 1990) (citing *Strickland v. Washington*, 466 U.S. 668, 698 (1984)). "Therefore, in a situation where a trial court has previously heard a motion based on ineffective assistance of counsel," as here, "reviewing courts are free to make an independent determination of a trial court's conclusions. The factual findings of the trial court, however, shall not be set aside on appeal unless clearly erroneous." *Id.* (footnote citations omitted). But "[b]ecause this appeal comes to us on a motion for a new trial, there are few, if any, factual findings to review." *State v. Lenkart*, 2011 UT 27, ¶ 20 n.7, 262 P.3d 1.

ANALYSIS

I. Merger[2]

¶9     The State contends that the trial court erred by merging the twelve counts of discharge of a firearm into a single count for each defendant. The trial court ruled that the multiple shots fired toward the house and cars constituted one offense because the shots were all part of a "single criminal episode." *See* Utah Code Ann. § 76-1-401 (LexisNexis 2012). Relying on case law, the court also

---

2. We compliment the parties on their exemplary briefing of this complex issue.

ruled that the multiple shots constituted one offense because the multiple shots were animated by "one intention, one general impulse, and one plan." *See State v. Crosby*, 927 P.2d 638, 645 (Utah 1996) (citation and internal quotation marks omitted). The State argues that the trial court erred by relying on the "single criminal episode" statute and case law interpreting it rather than looking to the firearm discharge statute to determine how many counts Defendants may be convicted of. We agree.[3]

¶10    Though not presented in this fashion, the question before the trial court was one of multiplicity and double jeopardy. Among the protections embodied in the Double Jeopardy Clause of the United States Constitution is "protection against multiple punishments for the same offense." *Bernat v. Allphin*, 2005 UT 1, ¶ 11, 106 P.3d 707 (citing *Justices of Boston Mun. Court v. Lydon*, 466 U.S. 294, 306–07 (1984)). The problem of multiplicity arises when "a single offense [is charged] in several counts." Charles Alan Wright et al., 1A *Federal Practice & Procedure*: *Criminal* § 142, at 10 (4th ed. 2008). The "rule against multiplicity . . . 'is intended to prevent multiple punishments for the same act,'" thus guarding against double jeopardy by "'prohibit[ing] the Government from charging a single offense in several counts.'" *State v. Morrison*, 2001 UT 73, ¶ 26, 31 P.3d 547 (emphases omitted) (quoting *United States v. Kimbrough*, 69 F.3d 723, 729 (5th Cir. 1995)). When a defendant has been charged under multiple counts for the same offense, the court may merge the counts to avoid a double jeopardy violation. *See Lee*, 2006 UT 5, ¶¶ 30–31. Therefore, to determine whether merger was appropriate, the relevant question is what constitutes a single offense.

¶11    The trial court answered this question by turning to the definition of "single criminal episode" in the Utah Code. *See* Utah

---

3. Because we agree with the State's main contention, we do not address its alternative argument that the events involved two criminal episodes.

Code Ann. §§ 76-1-401 to -403 (LexisNexis 2012). The single criminal episode statute enlarges double jeopardy protections. The Fifth Amendment prohibits any person "for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. The single criminal episode statute "expand[s] the scope of offenses barred from multiple trials beyond 'the same offense' focus in double jeopardy, to all offenses arising from a 'single criminal episode.'" *State v. Strader*, 902 P.2d 638, 641 (Utah Ct. App. 1995) (citing Utah Code Ann. §§ 76-1-402(2), -403(1) (1995); Utah R. Crim. P. 9.5; *State v. Franklin*, 735 P.2d 34, 35–36 (Utah 1987)); *see also State v. Sommerville*, 2013 UT App 40, ¶ 34 n.11, — P.3d — . The statute is thus "designed to protect a defendant from multiple trials for offenses that are part of a 'single criminal episode.'" *Sommerville*, 2013 UT App 40, ¶ 7 (citation omitted). Accordingly, subject to stated qualifications, such as where "the court otherwise orders to promote justice," section 76-1-402(2) of the Utah Code prohibits separate trials for "separate offenses" arising "under a single criminal episode." Utah Code Ann. § 76-1-402(2).

¶12    The statute defines a single criminal episode as "all conduct which is closely related in time and is incident to an attempt or an accomplishment of a single criminal objective." *Id*. § 76-1-401. This definition of "single criminal episode" explains how closely "separate offenses" must be connected to fall within the statutory requirement of a single prosecution; it does not define "separate offense." Indeed, the purpose of the provision is to require a single trial on "separate offenses" that are "closely related in time" and "incident to an attempt or an accomplishment of a single criminal objective." *Id*. Accordingly, the fact that separate acts fall within the definition of "single criminal episode" does not establish that they are a single offense. *See, e.g., State v. Porter*, 705 P.2d 1174, 1178 (Utah 1985) ("Although defendant's crimes were committed during a single criminal episode, he committed two distinct burglaries separately punishable under section 76-1-402."); *State v. James*, 631 P.2d 854, 856 (Utah 1981) ("Double jeopardy . . . does not prevent multiple convictions for multiple offenses arising from a single criminal episode."). On the contrary, Utah law expressly provides

that "[a] court may impose consecutive sentences for offenses arising out of a single criminal episode as defined in Section 76-1-401." Utah Code Ann. § 76-3-401(5) (LexisNexis 2012). Accordingly, a determination that separate acts—in this case, shots from a gun—are part of a single criminal episode does not mean that they cannot be punished separately, but that—again, subject to enumerated qualifications—they must be tried together. Thus, the single criminal episode statute does not resolve the question before us.[4]

¶13   The trial court also applied a test used to determine what constitutes a single offense in the context of theft. Our supreme court has held that the test to determine whether multiple takings constitute a single offense or multiple offenses considers the intent of the defendant:

> "[T]he general test as to whether there are separate offenses or one offense is whether the evidence discloses one general intent or discloses separate and distinct intents. . . . If there is but one intention, one general impulse, and one plan, even though there is a series of transactions, there is but one offense . . . ."

*State v. Kimbel*, 620 P.2d 515, 518 (Utah 1980) (alteration and second omission in original) (quoting *People v. Howes*, 222 P.2d 969, 976 (Cal. Dist. Ct. App. 1950)); *see also State v. Crosby*, 927 P.2d 638, 645 (Utah 1996) (following *Kimbel* in context of theft); *State v. Irvin*, 2007

---

4. Nor is section 76-1-402(1) relevant to this case. That provision states that "when the same act of a defendant under a single criminal episode shall establish offenses which may be punished in different ways under different provisions of this code, the act shall be punishable under only one such provision." Utah Code Ann. § 76-1-402(1) (LexisNexis 2012). The present case involves multiple charges under the same provision, not different provisions.

UT App 319, ¶¶ 18–19, 169 P.3d 798 (following *Kimbel* in context of aggravated robbery).

¶14    This rule is sometimes referred to as the "single larceny doctrine." *See State v. Barker*, 624 P.2d 694, 695 (Utah 1981); *State v. McClanahan*, 836 P.2d 1164, 1166–67 (Kan. 1992). The gist of the doctrine is that "if the taking . . . constitutes but a single act, then there is but one offense and the multiple ownership of the property taken is immaterial." *Barker*, 624 P.2d at 695. "The overriding principle behind the single larceny doctrine is to prevent the state from aggregating multiple criminal penalties for a single criminal act." *Richardson v. Commonwealth*, 489 S.E.2d 697, 700 (Va. Ct. App. 1997) (en banc). The doctrine thus often operates as a "humane rule," because "[i]f each article stolen were of a value sufficient to make the crime a felony, and a separate charge could be filed as to each, a defendant, if convicted, might be sentenced to the penitentiary for the rest of his life." *Sweek v. People*, 277 P. 1, 3 (Colo. 1929). *See generally* 50 Am. Jur. 2d *Larceny* §§ 4–8.[5]

¶15    The single larceny doctrine thus evolved to limit charging discretion in the context of aggregating or separating theft counts based on their dollar values for the purpose of maximizing criminal liability. No Utah court has applied this test beyond the context of theft-related crimes. *See State v. Escamilla-Hernandez*, 2008 UT App 419, ¶¶ 10–11, 198 P.3d 997 ("We are not persuaded that competent counsel should have argued for an extension of these larceny cases to the arena of child sexual abuse."); *State v. Smith*, 2003 UT App 179, ¶¶ 17–19, 72 P.3d 692 (distinguishing cases involving "theft over time" from attempted tax evasion); *see also Barker*, 624 P.2d at 696 (analogizing to the doctrine without adopting it in the context of a criminal mischief charge for damaging the windshields of

---

5. On the other hand, the prosecution may seek to aggregate thefts under the single larceny doctrine to convict a defendant of a single felony rather than several misdemeanors. *See, e.g., State v. Barker*, 624 P.2d 694, 695 (Utah 1981).

sixteen vehicles, and rejecting the State's argument that the doctrine required reversal, because "the factual prerequisite for the application of the single larceny doctrine, i.e., a single act, is absent"). We similarly decline to extend the single larceny doctrine to this case, which does not involve the grouping of multiple thefts.

¶16 Rasabout and the State both suggest, and we agree, that distinguishing a single, continuous offense from separate, distinct offenses is primarily a question of interpreting the text of the statute defining the crime. *See State v. Morrison*, 2001 UT 73, ¶¶ 25–26, 31 P.3d 547 (analyzing the statute to determine whether multiple charges involved a single offense); *State v. James*, 631 P.2d 854, 855–56 (Utah 1981) (same); *Escamilla-Hernandez*, 2008 UT App 419, ¶¶ 11–13 (same); *State v. Irvin*, 2007 UT App 319, ¶¶ 15–17, 169 P.3d 798 (same); *State v. Suarez*, 736 P.2d 1040, 1042 (Utah Ct. App. 1987) (same); *see also United States v. Kimbrough*, 69 F.3d 723, 730 (5th Cir. 1995) ("We must defer to the legislature's determination of whether a specific course of conduct constitutes one or more separate crimes." (citing *Sanabria v. United States*, 437 U.S. 54, 70 (1978))). Thus, "at its core, the issue of duplicity or multiplicity is one of statutory interpretation." Charles Alan Wright et al., 1A *Federal Practice & Procedure: Criminal* § 142, at 13 (4th ed. 2008).

¶17 The key question in reviewing the statute is what the legislature has determined to be the "allowable unit of prosecution." *See United States v. Universal C.I.T. Credit Corp.*, 344 U.S. 218, 221 (1952). "'The test is whether the individual acts are prohibited, or the course of action which they constitute. If the former, then each act is punishable separately. . . . If the latter, there can be but one penalty.'" *Blockburger v. United States*, 284 U.S. 299, 302 (1932) (omission in original) (quoting *Wharton's Criminal Law* § 34 n.3 (11th ed.)). "Whether a particular course of conduct involves one or more distinct 'offenses' under the statute depends on this [legislative] choice." *Sanabria*, 437 U.S. at 70. Thus, "'[t]he question of what punishments are constitutionally permissible is not different from the question of what punishments the Legislative Branch intended to be imposed.'" *State v. McCovey*, 803 P.2d 1234,

1239 (Utah 1990) (quoting *Albernaz v. United States*, 450 U.S. 333, 344 (1981)), *modified by State v. Smith*, 2005 UT 57, ¶ 11 & n.4, 122 P.3d 615 (addressing the method of determining "what punishments the Legislative Branch intended to be imposed"). We therefore turn to an analysis of the firearm discharge statute.

¶18    "When interpreting a statute, we look first to its text." *Richards v. Brown*, 2012 UT 14, ¶ 23, 274 P.3d 911. The text of the statute under which Defendants were convicted makes it a crime to discharge a firearm from a vehicle:

> (1)(a) A person may not discharge any kind of dangerous weapon or firearm:
>> (i) from an automobile or other vehicle;
>> (ii) from, upon, or across any highway;
>> . . .
>> (vii) without written permission to discharge
> the dangerous weapon from the owner or person in charge of the property within 600 feet of:
>>> (A) a house, dwelling, or any
>> other building . . . .

Utah Code Ann. § 76-10-508(1) (LexisNexis Supp. 2007) (current version at *id.* § 76-10-508(1) (2012)). The statute also includes a felony enhancement if, among other things, the offender discharges the firearm in the direction of a building or vehicle with the intent to damage the building or intimidate or harass another person.[6]

---

6.  The text of the enhancement is as follows:
> (2) A violation of any provision of this section is a class B misdemeanor unless the actor discharges a firearm under any of the following circumstances not amounting to criminal homicide or attempted criminal homicide, in which case it is a third degree felony and the convicted person shall be sentenced to
>> (continued...)

¶19    The Utah Legislature has given us tools for construing criminal statutes. Section 76-1-106 declares that "[a]ll provisions of this code and offenses defined by the laws of this state shall be construed according to the fair import of their terms to promote justice and to effect the objects of the law and general purposes of Section 76-1-104." Utah Code Ann. § 76-1-106 (LexisNexis 2012). Section 76-1-104 provides in part that the criminal code should be construed to "[d]efine adequately the conduct and mental state which constitute each offense and safeguard conduct that is without fault from condemnation as criminal," and to "[p]rescribe penalties which are proportionate to the seriousness of offenses and which permit recognition or differences in rehabilitation possibilities among individual offenders." *Id.* § 76-1-104(2), -104(3).

¶20    Our supreme court has applied these principles in analyzing a multiplicity challenge. For example, in *State v. Morrison*, 2001 UT 73, 31 P.3d 547, the court addressed a challenge to the sexual exploitation of a minor statute. Morrison argued that, under the statute, possession of fifty offending images constituted a single

_____

6. (...continued)

an enhanced minimum term of three years in prison:

(a) the actor discharges a firearm in the direction of any person or persons, knowing or having reason to believe that any person may be endangered;

(b) the actor, with intent to intimidate or harass another or with intent to damage a habitable structure as defined in Subsection 76-6-101(2), discharges a firearm in the direction of any building; or

(c) the actor, with intent to intimidate or harass another, discharges a firearm in the direction of any vehicle.

Utah Code Ann. § 76-10-508(2) (LexisNexis Supp. 2007) (current version at *id.* § 76-10-508.1 (2012)).

offense, not fifty offenses. The statute in effect at that time forbade the possession or production of "'any visual representation'" of child pornography. *Id.* ¶ 25 (quoting Utah Code Ann. § 76-5a-2(3) (1999)). Construing this provision "'according to the fair import of [its] terms to promote justice,'" *id.* (alteration in original) (quoting Utah Code Ann. § 76-1-106 (1999)), the court held that "[t]he clearest reading of the statute is that each individual 'visual representation' of child pornography that is knowingly possessed by a defendant constitutes the basis for a separate offense." *Id.* ¶ 26. "Therefore, the rule against multiplicity was not violated" when Morrison was charged with fifty separate offenses. *Id.*

¶21    We approach the firearm discharge statute in the same straightforward way. Under this statute, "[a] person may not discharge any kind of dangerous weapon or firearm" under the stated conditions. Utah Code Ann. § 76-10-508(1)(a) (LexisNexis Supp. 2007). The crux of the question is what the Legislature meant by the word *discharge*. The dictionary definition of the verb *discharge* is clear. In the present context it means simply to "fire a weapon," *MacmillanDictionary.com*, http://www.macmillandictionary.com/dictionary/american/discharge (last visited March 14, 2013), or to "shoot," *Merriam-Webster*, http://www.merriam-webster.com/dictionary/discharge (last visited March 14, 2013). We therefore conclude that the "clearest reading of the statute" is that each act of firing a gun constitutes a separate offense, or unit of prosecution. *See Morrison*, 2001 UT 73, ¶ 26. Here, Rasabout fired his weapon, or shot, twelve times. Accordingly, reading the statute according to the "fair import" of its terms as well as its plain language, these shots violated the statutory prohibition twelve times. *See* Utah Code Ann. § 76-1-106 (LexisNexis 2012).[7]

---

7. Kaykeo was charged as a party to the offense. *See* Utah Code Ann. § 76-2-202 (LexisNexis 2012).

¶22     So interpreted, the statute is sufficiently clear to "safeguard conduct that is without fault from condemnation as criminal." *See id.* § 76-1-104(2). The present case poses no such danger, as Rasabout's multiple shots at the home and car were not "without fault." And we are satisfied that, as construed, the statute "[prescribes] penalties which are proportionate to the seriousness of offenses and which permit recognition or differences in rehabilitation possibilities among individual offenders." *Id.* § 76-1-104(3). We agree with the State that "if one shot is dangerous, two shots are even more dangerous, and 12 shots are more dangerous still. Every time the gunman pulls the trigger, he fires a bullet that could kill someone, damage property, or both . . . ." We recognize that shooting twelve shots in rapid succession may not be twelvefold more culpable than shooting a single shot, but we cannot escape the conclusion that it is nevertheless more culpable.

¶23     Rasabout argues that because the statute "does not specifically define" the term *discharge*, "the plain language of the statute does not clearly indicate whether the legislature intended the allowable unit of prosecution to be each 'single shot' fired as the State argues, or the firing of the firearm which could result in a series of shots." Although the statute does not specifically define *discharge*, we are not persuaded that this omission results in ambiguity. To *discharge* a weapon means to fire or shoot it. Rasabout cites no case, dictionary, or compendium to support his assertion that, unlike words such as *gunfire* or *burst*, *discharge* can mean firing a series of shots.[8]

---

8. Rasabout does cite one case that appears to have treated *discharge* as meaning the firing of a series of shots. *See McPherson v. State*, 933 So. 2d 1114, 1118 (Ala. Crim. App. 2005). However, that case turned on the issue of whether multiple victims could serve as the basis for multiple counts of discharging a firearm into a dwelling. *See id.* The court determined that the number of victims was irrelevant, but it otherwise did not address the meaning of *discharge*. *See id.*

¶24    Rasabout and Kaykeo also rely on the unchallenged finding of the trial court that "most of the shots were fired nonstop, and all the shots were fired in less than a minute," and thus that Defendants had "one general intent in firing the several shots, which was to intimidate or harass" the occupants of the house. This finding is relevant to a determination of whether Defendants' acts were committed within a single criminal episode. But as noted above, the fact that criminal acts fall within a single criminal episode means that they must be charged in a single prosecution, not that they must be charged in a single count.

¶25    Rasabout notes that other states are divided over whether a series of gunshots constitutes a single discharge or multiple discharges. This is certainly true. Some courts hold that each shot fired constitutes a separate offense. *See, e.g., Hennemeyer v. Commonwealth*, 580 S.W.2d 211, 214 (Ky. 1979) (holding that six separate gunshots fired by a defendant at pursuing police over a span of fifteen minutes constituted six separate counts of wanton endangerment); *State v. Morrow*, 888 S.W.2d 387, 392–93 (Mo. Ct. App. 1994) ("The conduct proscribed is complete on one shot. A subsequent shot, whether moments or a substantial amount of time later, creates the same danger which the statute was intended to prevent. . . . [T]he individual act of shooting a single shot is prohibited."), *superseded by statute on other grounds as stated in State v. French*, 79 S.W.3d 896, 899–900 (Mo. 2002) (en banc); *State v. Rambert*, 459 S.E.2d 510, 513 (N.C. 1995) (holding that defendant was properly charged with three counts of discharging a firearm where "defendant's actions were three distinct and, therefore, separate events," explaining that "[e]ach shot, fired from a pistol, as opposed to a machine gun or other automatic weapon, required that defendant employ his thought processes each time he fired the weapon" and that "[e]ach act was distinct in time, and each bullet hit the vehicle in a different place").

¶26    Other courts hold that multiple shots fired in rapid succession—or even not-so-rapid succession—constitute a single offense. *See, e.g., McPherson v. State*, 933 So. 2d 1114, 1118 (Ala.

Crim. App. 2005) (holding that defendant could only be convicted of one count of discharging a firearm into an occupied dwelling because, regardless of the number of victims inside a dwelling, defendant's two shots "involved only one unit of prosecution, which was the [defendant's] act of discharging the firearm into the [victims'] occupied dwelling"); *Williams v. State*, 90 So. 3d 931, 933–34 (Fla. Ct. App. 2012) (rejecting prosecution's argument that "each discharged bullet constituted a distinct act upon which separate convictions could rest" where defendant "fired eight shots in a short period of time with only a few seconds' pause between gunshots"); *State v. Demongey*, 2008-NMCA-066, ¶ 15, 187 P.3d 679 (holding that firing three shots separated by minutes and distance traveled was "unitary conduct," where the shots were fired during "one high-speed chase, in an extreme attempt to escape from the pursuing officer").[9]

¶27    In addition, some states determine the unit of prosecution based on judicial balancing of various factors, many of which are related more to the facts of the crime than to the language of their statutes. *See, e.g., People v. Rodarte*, 547 N.E.2d 1256, 1261–62 (Ill. App. Ct. 1989) ("Factors to be considered in determining whether a defendant's conduct constitutes separate acts or merely distinct parts of a single act are: (1) the time interval occurring between successive parts of the defendant's conduct; (2) the existence of an intervening event; (3) the identity of the victim; (4) the similarity of the acts performed; (5) whether the conduct occurred at the same location; and (6) prosecutorial intent."); *Harrell v. State*, 277 N.W.2d 462, 472–74 (Wis. Ct. App. 1979) (identifying the following factors: (1) the nature of the act; (2) temporal proximity; (3) multiple locations for an assault (including multiple locations on the victim's

---

9. Other states have found the unit of prosecution to be the number of victims targeted by the shooting. *See, e.g., Burleson v. Saffle*, 2002 OK CR 15, ¶ 7, 46 P.3d 150 (holding that the text and context of the state's drive-by shooting statute "indicate[] the Legislature's recognition that drive-by shootings often involve more than one victim—that is, constitute a crime against more than one person").

body); (4) defendant's intent; (5) cumulative punishment; (6) number of physical acts, such as pulls of a trigger; (7) number of victims); *see also State v. Fillman*, 223 P.3d 827, 834 (Kan. Ct. App. 2010) (applying similar factors in conjunction with an analysis of statutory language).

¶28 However, our analysis begins with the text of the statute and, if that text is unambiguous, ends there. *See Richards v. Brown*, 2012 UT 14, ¶ 23, 274 P.3d 911 ("Where a statute's language is unambiguous and provides a workable result, we need not resort to other interpretive tools, and our analysis ends."). And the fact that courts in other states—looking at other factual situations, interpreting other statutes, and in many cases using other interpretive approaches—come to inconsistent conclusions does not persuade us that our statute is ambiguous.

¶29 Finally, Rasabout argues, where the statute does not address the allowable unit of prosecution, he is entitled to lenity. Rasabout cites the United States Supreme Court's statement that "it is appropriate, before we choose the harsher alternative, to require that [the legislature] should have spoken in language that is clear and definite. We should not derive criminal outlawry from some ambiguous implication." *United States v. Universal C.I.T. Credit Corp.*, 344 U.S. 218, 221–22 (1952).

¶30 To be clear, while the rule of lenity may in some contexts serve to safeguard a defendant's constitutional rights, the rule is one of statutory construction, not constitutional law. *See, e.g., Clark v. Martinez*, 543 U.S. 371, 398 (2005) (Thomas, J., dissenting) ("[T]he rule of lenity is wholly independent of the rules governing constitutional adjudication."); *Bifulco v. United States*, 447 U.S. 381, 387 (1980) (describing the rule of lenity as a "principle of statutory construction"); *Gollehon v. Mahoney*, 626 F.3d 1019, 1027 (9th Cir. 2010) (describing the rule of lenity as "simply a canon of statutory construction"); *United States v. Rivera*, 265 F.3d 310, 312 (5th Cir. 2001) (describing the rule of lenity as "a rule of statutory construction . . . rather than a separate constitutional framework for

raising claims"); *Lurie v. Wittner*, 228 F.3d 113, 126 (2d Cir. 2000) ("The rule of lenity is a canon of statutory construction, not in itself federal law."); *Sabetti v. Dipaolo*, 16 F.3d 16, 19 (1st Cir. 1994) (stating that, other than the "fair notice" guarantee, petitioner "has not pointed to anything in the federal Constitution . . . that would *require* a state court to apply the rule of lenity when interpreting a state statute").

¶31    More specifically, lenity is "'an ancient rule of statutory construction that penal statutes should be strictly construed against the government . . . and in favor of the persons on whom such penalties are sought to be imposed.'" *United States v. Mabry*, 518 F.3d 442, 452 (6th Cir. 2008) (omission in original) (quoting 3 N. Singer, *Sutherland Statutory Construction* (6th ed. 2007)). However, our Legislature appears to have rejected the rule of lenity as a permissible canon of statutory construction, stating that "[t]he rule that a penal statute is to be strictly construed shall not apply to this code, any of its provisions, or any offense defined by the laws of this state." Utah Code Ann. § 76-1-106 (LexisNexis 2012); *see also State v. Knepper*, 418 P.2d 780, 782 (Utah 1966) (applying a previous version of this statute to reject a defendant's invocation of the rule of lenity). *Cf. People v. Morrison*, 120 Cal. Rptr. 3d 502, 506 (Cal. Ct. App. 2011) (referring to California's similarly worded provision as "California's anti-lenity statute"). *But see State v. Bradshaw*, 2006 UT 87, ¶ 10, 152 P.3d 288 (noting, while neither rejecting nor applying the rule of lenity, that courts may not apply the rule, which "illuminate[s] definition indirectly," without first looking to "authoritative extra-textual sources," such as non-Utah precedent); *State v. Kenison*, 2000 UT App 322, ¶ 8, 14 P.3d 129 (following the rule "that a defendant is entitled to the benefit of the lesser penalty afforded by an amended statute made effective prior to sentencing" and labeling it a "rule of lenity" (citation and internal quotation marks omitted)).

¶32    At any rate, even if section 76-1-106 would permit us to invoke the rule of lenity where a criminal statute suffers from ambiguity, as Rasabout urges, or "*egregious* ambiguity," as at least

one court has held, *see People v. Manzo*, 270 P.3d 711, 717 (Cal. 2012), we are not persuaded that the statute before us falls into either category. Thus, we need not resort to that interpretive canon here.

¶33    In sum, because we conclude that the unit of prosecution under the firearm discharge statute is each discrete shot, we reverse the trial court's ruling merging the twelve counts into a single count for each defendant.[10]

## II. Ineffective Assistance of Counsel

¶34    On cross-appeal, Kaykeo contends that his trial counsel was constitutionally deficient because he did not adequately investigate Kaykeo's alibi. Kaykeo argues that his counsel's investigation was inadequate because he failed to contact corroborating witnesses and failed to request police dispatch logs that would have corroborated the time frame of his alibi.

¶35    A claim of ineffective assistance of counsel requires proof of two elements: "First, the defendant must show that counsel's performance was deficient. . . . Second, the defendant must show that the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also State v. Lenkart*, 2011 UT 27, ¶ 25, 262 P.3d 1. To prove constitutionally deficient performance, "the defendant must show that counsel's representation fell below an objective standard of reasonableness" in light of all the circumstances. *Strickland*, 466 U.S. at 687–88. Furthermore, the defendant must overcome "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" and that "under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689 (citation and internal quotation marks omitted); *see also State v. Litherland*, 2000 UT 76, ¶ 19, 12 P.3d 92.

---

10. We express no opinion on how the firearm discharge statute would apply to a weapon that propels multiple projectiles with a single pull of the trigger.

¶36 "[O]ne of criminal defense counsel's most fundamental obligations is to investigate the underlying facts of a case. This duty is not optional; it is indispensable." *Lenkart*, 2011 UT 27, ¶ 28. As our supreme court held in *State v. Templin*, 805 P.2d 182 (Utah 1990), the failure to adequately investigate a case constitutes deficient performance:

> If counsel does not adequately investigate the underlying facts of a case, including the availability of prospective defense witnesses, counsel's performance cannot fall within the "wide range of reasonable professional assistance." This is because a decision not to investigate cannot be considered a tactical decision. It is only after an adequate inquiry has been made that counsel can make a reasonable decision to call or not to call particular witnesses for tactical reasons.

*Id.* at 188 (quoting *Strickland*, 466 U.S. at 689); *see also Gregg v. State*, 2012 UT 32, ¶¶ 23–25, 31–34, 279 P.3d 396; *Lenkart*, 2011 UT 27, ¶¶ 27–28.

¶37 The adequacy or reasonableness of the investigation is the controlling factor. *See Taylor v. State*, 2007 UT 12, ¶ 47, 156 P.3d 739 (citing *Wiggins v. Smith*, 539 U.S. 510, 522–23 (2003)); *State v. Hales*, 2007 UT 14, ¶¶ 69–70, 152 P.3d 321. "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690–91; *see also Taylor*, 2007 UT 12, ¶ 47. Thus, "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691; *see also Taylor*, 2007 UT 12, ¶ 48.

¶38 In determining the reasonableness of an investigation, "we look to the information available to trial counsel" at the time of the

challenged conduct. *Taylor*, 2007 UT 12, ¶¶ 48–49; *see also Hales*, 2007 UT 14, ¶ 70. Thus, "inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions." *Strickland*, 466 U.S. at 691. "[W]hen a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." *Id.*

¶39    That is precisely what happened here. Kaykeo claims that his counsel was ineffective because he failed to contact potential alibi witnesses. Kaykeo stated in his declaration that he provided his defense counsel the names and contact information of four people who were at the party with him at the time of the shooting. Although Kaykeo did not name the four individuals in his declaration, Kaykeo provided the trial court with declarations from the host of the party and the driver of the BMW that was pulled over with Kaykeo and Rasabout. If believed, these witnesses' testimony may well have exonerated Kaykeo. The host stated that Kaykeo was at the party until he left to take Rasabout home. The driver of the BMW confirmed this account and stated that he followed Kaykeo and Rasabout from the party, that the car Kaykeo was driving never left his sight, and that he never saw or heard any shots fired from Kaykeo's car.

¶40    However, according to the affidavit provided by Kaykeo's defense counsel, Kaykeo told his attorney that he did not know anyone at the party and he never provided an address or location of the party. Kaykeo's defense counsel stated that despite his requests for potential witness names, Kaykeo never provided him with any names, stating only that he was at the party with his girlfriend but that she "would not be helpful because she was 'mad at him.'"

¶41    The trial court accepted Kaykeo's defense counsel's version of events. Kaykeo had stated at trial that he only knew the general location of the party and, aside from his girlfriend and Rasabout,

the others at the party were only acquaintances. In light of this testimony, the trial court stated that the affidavit provided by Kaykeo's counsel was consistent with Kaykeo's trial testimony, while Kaykeo's declaration was not.

¶42    Kaykeo did not request an evidentiary hearing below. Therefore, our review is limited to the affidavits and declarations provided to the trial court. *See State v. Litherland*, 2000 UT 76, ¶ 17, 12 P.3d 92. Nor does Kaykeo mention or challenge the trial court's credibility determination. When "[n]either party challenges the trial court's findings of fact, . . . we assume them to be correct." *Jacobs v. Hafen*, 917 P.2d 1078, 1078 (Utah 1996). We also defer to the trial court's determination of the credibility of Kaykeo and his counsel, not based on its review of the dueling affidavits, but based on its superior position to judge the credibility of Kaykeo and his counsel, having observed them at trial. *Cf. State v. Calliham*, 2002 UT 86, ¶ 23, 55 P.3d 573 (deferring to a trial court's ruling that a psychological examination was not needed, even though that ruling was based primarily on a preliminary trial transcript, because in contrast to the appellate court's examination of a cold record, the trial court made its determination "having personally observed the quality of the evidence, the tenor of the proceedings, and the demeanor of the parties").

¶43    Therefore, according to the facts accepted by the trial court, Kaykeo never informed his counsel of the two witnesses who could corroborate his alibi. Kaykeo's counsel inquired about potential witnesses and was given only one lead. He did not follow that lead, because Kaykeo dissuaded him from doing so.

¶44    Based on these facts, the only possible basis for a claim of inadequate investigation is counsel's failure to follow up with the girlfriend. But this failure did not constitute deficient performance in this case. As noted above, in deciding whether Kaykeo's counsel provided deficient performance, we "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland v. Washington*, 466

U.S. 668, 689 (1984). Furthermore, the adequacy of an investigation "may be determined or substantially influenced by the defendant's own statements or actions." *Id.* at 691. Accordingly, we cannot ignore—nor can we expect Kaykeo's counsel to have ignored—Kaykeo's statement that his girlfriend "would not be helpful because she was 'mad at him.'" Counsel could have interpreted this statement to mean that she would not be willing to provide names of other witnesses, that she would lie out of spite and provide harmful but false testimony, or that she would be unwilling to lie and would provide harmful but true testimony. Because Kaykeo gave his counsel "reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." *See id.* In light of these facts, Kaykeo's counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *See id.* at 690.

¶45 Regarding Kaykeo's claim of ineffective assistance based on his counsel's failure to obtain the police dispatch logs, we note that the dispatch logs are not part of the record on appeal. Without them, Kaykeo cannot prove that his counsel acted deficiently. "Where the record appears inadequate in any fashion, ambiguities or deficiencies resulting therefrom simply will be construed in favor of a finding that counsel performed effectively." *Litherland*, 2000 UT 76, ¶ 17. Furthermore, Kaykeo cannot prove that he was prejudiced by his counsel's failure to request the dispatch logs. A defendant "cannot meet the prejudice prong of the *Strickland* test simply by identifying unexplored avenues of investigation. Rather, he must demonstrate a reasonable probability that further investigation would have yielded sufficient information to alter the outcome of his [case]." *Parsons v. Barnes*, 871 P.2d 516, 523–24 (Utah 1994); *see also Litherland*, 2000 UT 76, ¶ 17; *State v. Chacon*, 962 P.2d 48, 50 (Utah 1998) (stating that prejudice may not be established as "a speculative matter" (citation and internal quotation marks omitted)).

¶46 Because Kaykeo has failed to demonstrate that his counsel was deficient in failing to contact potential witnesses, and that his counsel's failure to obtain the dispatch logs was deficient and prejudiced his case, Kaykeo's claim of ineffective assistance fails.[11]

CONCLUSION

¶47 The trial court erred by merging Rasabout's and Kaykeo's twelve counts of discharge of a firearm into one count each. Based on the language of the statute, the allowable unit of prosecution is one count for each shot fired from the weapon. Therefore, we reverse the trial court's order merging the separate counts and remand for resentencing.

---

11. Kaykeo claims that his trial counsel was ineffective for a number of other reasons, such as failing to investigate possible legal defenses before trial and failing to file "even a single motion or proposed jury instruction" based on those defenses. In his opening brief, Kaykeo does not identify which legal defenses trial counsel should have asserted, which motions his counsel should have filed, or which jury instructions should have been given. Therefore, he has not carried his burden of persuasion on appeal. *See* Utah R. App. P. 24(a)(9); *State v. Thomas*, 961 P.2d 299, 305 (Utah 1998). *See also State v. Lenkart*, 2011 UT 27, ¶ 27, 262 P.3d 1 ("[A] defendant must identify *specific* acts or omissions which, under the circumstances, show that counsel's representation fell below an objective standard of reasonableness." (emphasis added) (citation and internal quotation marks omitted)). In his reply brief, Kaykeo argues that his counsel was ineffective for not moving to bifurcate Kaykeo and Rasabout's trial and for not challenging the admission of evidence of Rasabout's gang affiliation under rule 404(b) of the Utah Rules of Evidence. "It is well settled that issues raised by an appellant in the reply brief that were not presented in the opening brief are considered waived and will not be considered by the appellate court." *Allen v. Friel*, 2008 UT 56, ¶ 8, 194 P.3d 903 (citation and internal quotation marks omitted).

¶48    On cross-appeal, Kaykeo has not established that his counsel provided ineffective assistance at trial. Therefore, the trial court correctly denied his motion for new trial on this ground, and we affirm.

———

ORME, Judge (concurring in part and concurring in the result in part):

¶49    I concur in section I of the lead opinion but concur only in the result reached in section II. Given the difficulties in determining the adequacy of trial counsel's performance based on conflicting affidavits and given the lack of an evidentiary hearing below to resolve the conflict, I am persuaded that the best course is to resolve the ineffective assistance claim raised by Kaykeo[12] purely on the prejudice prong, as our cases allow us to do. *See, e.g., State v. Arguelles*, 921 P.2d 439, 441 (Utah 1996) ("Unless [the defendant] has demonstrated that he was prejudiced by his trial counsel's performance, we need not decide whether that performance was deficient."); *State v. Strain*, 885 P.2d 810, 814 (Utah Ct. App. 1994) ("[I]n cases in which it is 'easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice,' we will do so without addressing whether counsel's performance was professionally unreasonable.") (quoting *Strickland v. Washington*, 466 U.S. 668, 697 (1984)).

¶50    The requisite showing of prejudice in an ineffective assistance claim cannot be established by simply "identifying unexplored avenues of investigation." *Parsons v. Barnes*, 871 P.2d 516, 523 (Utah 1994). Instead, a defendant must show a reasonable probability that further investigation would have resulted in a more favorable outcome at trial. *See id.* at 523–24. While Kaykeo

———

12. Rasabout does not join in Kaykeo's cross appeal or otherwise challenge the jury's verdict against him. The jury's determination that Rasabout fired the shots at the house, therefore, must be taken as a given in evaluating Kaykeo's claim.

avers that his trial counsel failed to investigate and call witnesses capable of corroborating his version of the events, Kaykeo wholly fails to establish that the added testimony of these witnesses would create a reasonable probability of acquittal. Even assuming that (1) these potential witnesses were subject to subpoena at the time of trial or that they were ready, willing, and able to testify voluntarily and (2) that there was no obvious obstacle to these witnesses being believed by the jury—e.g., prior criminal history admissible under rule 609 of the Utah Rules of Evidence—it is doubtful that the story these witnesses were ostensibly prepared to tell was even possible, let alone plausible.

¶51    According to the declarations of the two uncalled witnesses, Kaykeo had been at a party approximately five miles from where the shootings occurred for the entire evening and did not leave until Rasabout appeared and asked Kaykeo to be his designated driver. The uncalled witness who claims he drove behind them after they left the party declared that Rasabout's vehicle, which Kaykeo was driving, never left his sight and that he did not see or hear any gunshots coming from the vehicle before they were pulled over. This proposed testimony, according to Kaykeo, supposedly substantiates his unconvincing narrative that Rasabout, after engaging in two drive-by shooting attacks on the same house, immediately drove five miles to a party with the hope of finding a designated driver to take him home and then—to add insult to injury—allowed his unwitting driver to go right past the home he had riddled with bullets only minutes before. To believe such a fantastical tale, a jury would also have to believe that although Rasabout formed the plan to drive five miles in search of a designated driver, he did not have the good sense to direct that driver away from the scene of his just-completed crimes.[13]

---

13. Kaykeo testified that he and Rasabout were close, even describing Rasabout as a "cousin." Given that, the jury would have to assume that Rasabout was completely indifferent to the obvious

(continued...)

¶52    The timing of all these events only serves to exacerbate the utter implausibility of Kaykeo's alibi. The police arrived only minutes after the second round of shooting took place, and within a few moments of their arrival Kaykeo and Rasabout drove by and were pulled over. It would have seemed impossible to the jury, as it does to me, that, within such a minuscule time frame, Rasabout was able to drive five miles up the road, enter a party, locate Kaykeo, get Kaykeo to agree to drive him home, leave the party, and then head five miles back to where the shooting took place as a mere coincidence of heading for home. Even assuming that Rasabout was able to extricate Kaykeo from the party almost instantaneously, and without allowing any time for Kaykeo to say his goodbyes or gather his belongings, it is completely implausible, if not impossible, that even the round trip drive could be completed in that small amount of time.[14]

¶53    In my view, the proposed testimony of the uncalled witnesses does nothing to alleviate the many failings of Kaykeo's outlandish alibi defense. Consequently, I would resolve Kaykeo's ineffective assistance claim entirely on the prejudice prong of the *Strickland* test. He simply was not prejudiced by the jury's being spared these tall tales.

———————

13. (...continued)
risk that his close friend could be implicated in his crime if they drove past the scene of the crime on their way home.

14. Kaykeo and Rasabout were pulled over and arrested approximately 15 minutes after the shooting occurred. Taking judicial notice of the times and distances involved, as confirmed by MapQuest, the travel time from the scene of the crime to the party and then back—with no delay at the party once there—is 24 minutes. By those calculations, Kaykeo and Rasabout would have arrived roughly 10 minutes late to their own arrest.